COMMONWEALTH OF the NORTHERN
MARIANA ISLANDS, Plaintiff–
Appellee,

v.

Vincente Flores KAIPAT,
Defendant–Appellant.

No. 95–17239.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 8, 1996.

Decided Aug. 27, 1996.

Gregory Baka, Assistant Public Defender,
Saipan, MP, for defendant-appellant.

* The Honorable Harlington Wood, Jr., Senior
United States Circuit Judge for the Seventh Cir-

Nicole C. Forelli, Assistant Attorney Gen-
eral, Saipan, MP, for plaintiff-appellee.

Before: WOOD,* CANBY, and RYMER,
Circuit Judges.

RYMER, Circuit Judge:

We must decide whether a statute of the
Commonwealth of the Northern Mariana Is-
lands (CNMI) that earmarks civil and crimi-
nal fines imposed by the courts for a judicial
building fund deprived Vincente Flores Kai-
pat of due process of law in violation of the
Fourteenth Amendment to the United States
Constitution when he was fined by a judge of
the CNMI superior court.

Kaipat was found guilty of various traffic
offenses and was sentenced to a term of
imprisonment, probation, and a fine. He
challenged the fine on the ground that it was
used as a source of funding for a new judicial
complex pursuant to the Judicial Building
Fund Act of 1990, 1 CMC § 3405, thereby
creating an improper incentive for the court
to levy fines and calling into question the
impartiality of the trial judge in violation of
Kaipat's right to due process. The CNMI
Supreme Court affirmed the trial court's de-
nial of Kaipat's motion to reconsider the fine
in a published opinion. *Commonwealth v.
Kaipat,* No. 94–041 (CNMI Sup.Ct. Aug. 3,
1995).

We have not previously considered the due
process implications of a statute earmarking
funds that are generated by fines imposed by
courts for criminal offenses, but the United
States Supreme Court has provided book-
ends in *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct.
437, 71 L.Ed. 749 (1927) (due process violat-
ed by fine imposed by mayor-judge whose
compensation as judge was derived from, and
whose city coffers—for which he was respon-
sible—largely depended on, revenue from
fines), and *Dugan v. Ohio,* 277 U.S. 61, 48

cuit, sitting by designation.

S.Ct. 439, 72 L.Ed. 784 (1928) (due process not violated by fine imposed by mayor-judge whose compensation did not come from fines and who had no executive responsibility for city finances).[1] While there is little doubt that the CNMI legislature could have come up with a more felicitous way of funding construction of its courthouse, we conclude that this case is closer to *Dugan* than to *Tumey*, and that Kaipat has not shown a violation of his federal constitutional rights since the judge had no pecuniary interest in the fine and held no other position that could reasonably warrant a fear of partisan influence on his judgment.

As we have jurisdiction over Kaipat's timely appeal, 48 U.S.C. § 1824(a) and 1 CMC § 3103, we affirm.

## I

The Judicial Building Fund Act of 1990, 1 CMC § 3405,[2] creates a special fund within the Department of Finance known as the "Judicial Building Fund." It provides that all criminal and civil fines collected by Commonwealth courts and paid to the treasury are to be deposited and credited to the Fund. 1 CMC § 3405(a). The Fund was established "to pay the expenses to renovate and furnish existing Commonwealth judicial facilities in an aggregate amount not to exceed $250,000, and to construct and furnish a suitable building or buildings for the judicial branch of government." 1 CMC § 3405(b). The Governor is charged with expending the Fund and "consult[ing] closely with the Chief Justice as to the needs and requirements of the judicial branch for the construction of the judicial facilities." 1 CMC § 3405(c). Other funds may also be used by the Governor to build the facilities, and any funds left over after expenses and debts for the judicial complex have been paid will revert to the General Fund. 1 CMC § 3405(d), (e).

---

1. To some extent, as we shall explain, *infra*, [578–80], the Court has filled in the middle in *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976); *Connally v. Georgia*, 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977); *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980) *(per curiam)*; and *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986).

2. The Act provides in full:

(a) There is hereby established a special fund within the Department of Finance which shall be known and designated as the Judicial Building Fund. Commencing on March 15, 1991, all criminal and civil fines and all revenues collected by the courts of the Commonwealth pursuant to section 3403 of this chapter [rulemaking authority] or fines or fees collected pursuant to any other law and remitted or paid to the Commonwealth treasury pursuant to 7 CMC § 3206 [providing for monthly remission of fees] and 7 CMC § 3251 [providing for fines to be paid into the Commonwealth Treasury] shall be deposited and credited to the Judicial Building Fund.

(b) The purpose of the Judicial Building Fund shall be to pay the expenses to renovate and furnish existing Commonwealth judicial facilities in an aggregate amount not to exceed $250,000, and to construct and furnish a suitable building or buildings for the judicial branch of the government. The expenses, including those necessary for the renovation of existing Commonwealth judicial facilities, shall include, but not be limited to:

(1) The costs of professional assistance for planning, engineering and architectural services;

(2) Site acquisition;

(3) The cost of construction of the building or buildings; and

(4) The furnishing of the building or buildings, including any equipment, law books or other items necessary to make the facilities fully functional for the operations of the judicial branch.

(c) The Judicial Building Fund shall be expended by the Governor according to division 7 of this title [Governmental Planning, Budgeting, and Auditing]. The Governor shall consult closely with the Chief Justice as to the needs and requirements of the judicial branch for the construction of the judicial facilities.

(d) In order to expedite the construction of the judicial facility, the Governor may use the Judicial Building Fund as collateral for the advancement of architectural, design and construction services. Other funds properly allocated pursuant to local or federal law may also be used by the Governor to augment the Judicial Building Fund for the completion of the judicial facilities.

(e) Upon certification by the Director of Finance that all expenses and debts for the judicial facility have been paid in full and discharged, the Judicial Building Fund shall cease to exist and any funds remaining therein shall be deposited in the General Fund, and from the date of certification all further revenue produced by the courts of the Commonwealth shall be deposited in the General Fund.

Kaipat was sentenced on March 11, 1994, following his conviction by the court on two counts of driving under the influence of alcohol; two of reckless driving; two of refusal to submit to a breath test; and one count each of eluding a police officer, disobeying a traffic sign, speeding, unsafe passing, and following a vehicle too closely.[3] For these offenses a defendant may be sentenced to time in custody and may be fined up to $5,350. 9 CMC §§ 5202, 5251, 5304, 5309, 7104–7106, 7111, 7112. Kaipat was sentenced to 60 days imprisonment, with 30 days suspended for one year; he was given two years probation; he was fined in the amount of $1,000; he was required to perform 100 hours of community service; his driver's license was suspended for one year; and he was ordered to undergo counseling at the Commonwealth Health Center.

When Kaipat moved for reconsideration of the monetary portion of his sentence, claiming that it violated his due process rights, the superior court denied the motion after considering the standards that different courts have applied in determining whether a judge's interest in the outcome of a case implicates due process. First, it noted that some courts have held that only a "direct, personal, substantial, pecuniary interest" violates due process.[4] The court concluded that under this standard, § 3405 does not create such an interest for judges to levy fines because the Judicial Building Fund was created solely for the purpose of constructing improved judicial facilities, not for paying any funds to any judge, and no judge has any control over expenditures from the Fund. The superior court next observed that other courts have focused on *Tumey*'s "possible temptation to the average man as a judge"

standard.[5] The court concluded that § 3405 passes muster under this standard as well because actual construction of the new judicial complex depends on other funds, not on the comparatively much smaller sums deposited in the Judicial Building Fund. Finally, the superior court considered the "appearance of justice" test employed by the Court in *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (judge could not try case for which he served as one-man grand jury); *see also Pepsico, Inc. v. McMillen,* 764 F.2d 458, 460 (7th Cir.1985) (construing Judicial Code to require recusal of judge after contact about prospective employment with law firms representing parties in pending case on ground of appearance of impropriety), and found that a neutral observer, fully informed as to the relationship between the Judicial Building Fund and the new judicial complex at the time of Kaipat's sentencing, would not entertain significant doubts that he would receive impartial justice in this case.

The CNMI Supreme Court affirmed, on somewhat different reasoning. In its view, the *Tumey* "direct, personal, substantial, pecuniary" standard has not been extended to other bases of recusal for judges, *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (bias and prejudice); and *Tumey, Ward* and *Dugan* do not apply because in each, the Court was not concerned with whether an earmarking of fines alone violated a defendant's right to a fair trial but with whether the judge had a direct pecuniary interest in convicting the defendant. Further, the court concluded, Kaipat's allegations that the judges would benefit from a modern courthouse do not

---

**3.** Because Kaipat concedes that the evidence of guilt was overwhelming, he makes no argument that the judge's finding of guilt was also tarnished by the due process violation.

**4.** *Tumey,* 273 U.S. at 523, 47 S.Ct. at 441; *see State v. Conlin,* 171 Ariz. 572, 832 P.2d 225, 227 (App.1992) (earmarking of fines for drug enforcement fund, which included funding for court operations and additional pro tem judges, does not impair judges' impartiality as judges do not directly benefit and any amount that may be allocated to particular judge's court from fine that judge assessed is too attenuated to tempt average judge to forget standard of proof); *Maes*

*v. People,* 169 Colo. 200, 454 P.2d 792, 795 (1969) (interest must be direct, apparent, substantial, certain or immediate).

**5.** *Tumey,* 273 U.S. at 532, 47 S.Ct. at 444; *see Ward,* 409 U.S. at 60, 93 S.Ct. at 83 (due process violated when mayor-judge was responsible for town's finances and major portion of income came from court fines); *State v. Chinn,* 146 W.Va. 610, 121 S.E.2d 610, 612 (1961) (due process violated where judges' fixed salaries came solely from fund replenished by court fines).

implicate either an appearance of impropriety or indirect benefit which mandates recusal under the Fourteenth Amendment as they do not offend fundamental principles of justice under *Aetna* or our opinions in *Paradis v. Arave*, 20 F.3d 950 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 915, 130 L.Ed.2d 796 (1995), and *United States v. Heffington*, 952 F.2d 275 (9th Cir.1991).

After Kaipat's sentencing but before the superior court's decision on reconsideration, the legislature authorized a $15 million loan from the CNMI Retirement Fund for construction of the Judicial Complex.[6] The Judicial Building Financing Act of 1994, N.Mar. I.Pub.L. 9–3. Ground was broken for the new Saipan Judicial Complex March 5, 1995, and construction is currently underway.

## II

### A

*Tumey, Dugan* and *Ward* arose out of criminal trials in mayors' courts in Ohio where the mayor also served as judge. They offer the closest guidance for resolving the due process question in this case.

In *Tumey*, the mayor fined Tumey $100 after convicting him for unlawfully possessing liquor. By statute, the mayor was entitled to retain his costs (in addition to his regular salary) as compensation for hearing liquor cases if the defendant was convicted; there was no other way the mayor could be paid for his service as judge. Half of the fines assessed in the "liquor court" went to

the village of North College Hill to be used partly to pay marshals and detectives who secured convictions and who were supervised by the mayor, and partly for improvements and repairs to the village (where the mayor owned a house). Also by statute, the mayor was the village's chief executive officer and was charged with looking after the finances of the village as well as running the liquor court. Some $11,000 of the fines collected between May and December 1923 went to the village and $696 directly to the mayor. The Court held that Tumey was denied due process of law for two reasons. First, due process was violated because the judge had "a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case."[7] *Tumey*, 273 U.S. at 523, 47 S.Ct. at 441. The Court found no basis in the common law for condoning a system where the judge is paid for his service only when he convicts the defendant, and could not say that it was fair for a defendant to be brought before the mayor for judicial consideration of his guilt or innocence when the possible loss of monthly fees and costs might weigh against acquittal. *Id.* at 531–32, 47 S.Ct. at 444. Accordingly, it concluded that:

> [e]very procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law.

---

**6.** In enacting the 1994 Act, the legislature found that the projected income from revenue collected by the CNMI judiciary is between $700,000 and $800,000 per year; that debt service for a loan of $14.8 million for 15 years at 7.5% is $1,646,374 per annum, representing a shortfall of some $846,000 to $946,000 per year that the judicial branch cannot carry; and that the Legislature will have to fund this amount yearly from the General Fund. The 1994 Act accordingly directs the Director of Finance to repay the loan out of the General Fund to the extent that it is not paid out of the Judicial Building Fund. The trial court's memorandum decision denying Kaipat's motion to reconsider the fine refers to these legislative findings in support of its view that no superior court judge would reasonably believe that marginal increases in the size of the Fund would hasten completion of the complex, affect-

ing his judgment as to the size of a fine in a criminal case.

**7.** As the Court explained:

> All questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion. But it certainly violates the Fourteenth Amendment, and deprives a defendant in a criminal case of due process of law, to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case.

*Tumey*, 273 U.S. at 523, 47 S.Ct. at 441 (citation omitted).

*Id.* at 532, 47 S.Ct. at 444. Second, the mayor's interest in the financial condition of the village and his responsibility for it gave him a strong "official motive to convict and to graduate the fine to help the financial needs of the village." *Id.* at 535, 47 S.Ct. at 445; *see also id.* at 533, 47 S.Ct. at 444–45. Noting that the statutory scheme was itself "calculated to awaken the interest of all those in the village charged with the responsibility of raising the public money and expending it, in the pecuniarily successful conduct of such a [liquor] court," *id.* at 533, 47 S.Ct. at 444–45, the Court held that "[a] situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him," *id.* at 534, 47 S.Ct. at 445.

One year later, the Supreme Court limited *Tumey*'s second ground in *Dugan v. Ohio,* 277 U.S. 61, 48 S.Ct. 439, 72 L.Ed. 784 (1928). Whereas the duties of the mayor of North College Hall were primarily executive, the mayor of Xenia, the village involved in *Dugan,* had no executive functions but exercised only judicial functions. Although he was one of five members of the city commission, which exercised all the legislative power, Xenia was run by a city manager. The mayor's salary was fixed and he received no fees for his judicial work. Observing that in *Tumey,* "[t]he direct dependence of the mayor upon convictions for compensation for his services as a judge was found to be inconsistent with due process of law," *id.* at 64, 48 S.Ct. at 440, but was not the only reason for holding the Fourteenth Amendment to be violated,[8] the Court held that the principles in *Tumey* were inapplicable because:

> [t]he mayor of Xenia receives a salary which is not dependent on whether he convicts in any case or not. While it is true that his salary is paid out of a fund to

which fines accumulated from his court under all laws contribute, it is a general fund, and he receives a salary in any event, whether he convicts or acquits. There is no reason to infer on any showing that failure to convict in any case or cases would deprive him of or affect his fixed compensation. The mayor has himself as such no executive but only judicial duties. His relation under the Xenia charter, as one of five members of the city commission, to the fund contributed to by his fines as judge, or to the executive or financial policy of the city, is remote.

*Id.* at 65, 48 S.Ct. at 440.

The Court considered yet another mayor's court in *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). Ward was convicted by the mayor of two traffic offenses and fined $50 on each. The mayor of Monroeville had broad executive powers, exercised overall supervision of village affairs, and had the duty to account to the village council respecting village finances. A substantial part of village income was derived from .the fines, forfeitures, costs and fees imposed by the mayor in the mayor's court. Applying the "possible temptation" test announced in *Tumey,* the Court held:

> "[P]ossible temptation" may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. This, too, is a "situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, [and] necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him."

*Id.* at 60, 93 S.Ct. at 83 (quoting *Tumey,* 273 U.S. at 534, 47 S.Ct. at 445). The Court distinguished this situation from *Dugan* because "[t]here the Mayor of Xenia, Ohio, had

---

**8.** As Chief Justice Taft, who also delivered the opinion for the Court in *Tumey,* explained *Tumey*'s second basis:

> [A] defendant brought into court might with reason complain that he was not likely to get a fair trial or a fair sentence from a judge who as chief executive was responsible for the financial condition of the village, who could and did largely control the policy of setting up a liquor

court in the village with attorneys, marshals and detectives under his supervision, and who by his interest as mayor might be tempted to accumulate from heavy fines a large fund by which the running expenses of a small village could be paid, improvements might be made and taxes reduced.

*Dugan,* 277 U.S. at 65, 48 S.Ct. at 440.

judicial functions but only very limited executive authority. . . . In those circumstances, this Court held that the Mayor's relationship to the finances and financial policy of the city was too remote to warrant a presumption of bias toward conviction in prosecutions before him as judge." *Id.* at 60–61, 93 S.Ct. at 83.

Although not so closely on point, the Court has employed the "possible temptation" principle in other settings. For example, in *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), in the context of contempt proceedings conducted by the same judge who had served as the "one-man grand jury" under Michigan law, the Court held that a judge, having been part of the accusatory process cannot in the nature of things be wholly disinterested in the conviction or acquittal of the defendant.[9] In *Gibson v. Berryhill,* 411 U.S. 564, 578–579, 93 S.Ct. 1689, 1697–98, 36 L.Ed.2d 488 (1973), the Court considered a complaint that a state administrative board of optometrists in private practice was biased and could not provide the plaintiffs bringing charges against licensed optometrists competing with board members a fair and impartial hearing consistent with due process. Because members of the Board had a possible personal pecuniary interest in the proceedings, they were disqualified from adjudicating the dispute under *Tumey* and *Ward,* with the Court noting that *Ward* "indicates that the financial stake need not be as direct or positive as it appeared to be in *Tumey.*" *Id.* at 579, 93 S.Ct. at 1698. In *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n,* 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976), the Court distinguished the relationship between the judges and those being judged in *Tumey, Ward* and *Gibson* from school board members and teachers who had been on strike in violation of state law being disciplined, in part on the footing that the school board members were acting as policymakers, and in part because "the teachers did not show, and the Wisconsin courts did not find, that the Board members had the kind of personal or financial stake in the decision that might create a conflict of interest. . . ." *Id.* at 491–92, 96 S.Ct. at 2314. In *Connally v. Georgia,* 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977) *(per curiam),* a system in which justices of the peace were paid for issuance but not for nonissuance of search warrants was invalidated since "[i]t is, in other words, another situation where the defendant is subjected to what surely is judicial action by an officer of a court who has 'a direct, personal, substantial, pecuniary interest' in his conclusion to issue or to deny the warrant." *Id.* at 250, 97 S.Ct. at 548 (citation omitted). And in *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980), the Court upheld the constitutionality of § 16(e) of the Fair Labor Standards Act, 29 U.S.C. § 216(e), under which sums collected as civil penalties for unlawful employment of child labor were to be returned to the Employment Standards Administration of the Department of Labor to reimburse costs incurred by its assistant regional administrators in determining violations and assessing penalties. It concluded that the "rigid requirements" of *Tumey* and *Ward* are inapplicable to the determinations of the assistant regional administrators, who function more like a prosecutor than a judge, but went on to note that the influences relied

---

9. In that context the Court explained:

A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." *Tumey v. Ohio,* 273 U.S. 510, 532 [47 S.Ct. 437, 444, 71 L.Ed. 749]. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." *Offutt v. United States,* 348 U.S. 11, 14 [75 S.Ct. 11, 13, 99 L.Ed. 11] [ (clash between the presiding judge and defendant colored the course of the trial with personal overtones) ].

*Murchison,* 349 U.S. at 136, 75 S.Ct. at 625 (*Offutt* parenthetical added).

upon in cases such as *Tumey, Gibson,* and *Connally* are "entirely absent" since no government official stands to profit economically from enforcement of the child labor provisions of the Act, and the salary of the assistant regional administrator is fixed by law. *Id.* at 248, 250, 97 S.Ct. at 548, 548–49. Likewise, in the Court's view, there was no "realistic possibility" that the judgment of the administrators would be distorted by the prospect of institutional gain as a result of zealous enforcement efforts, since civil penalties collected under the statute represented less than 1% of the budget of the agency. *Id.* at 250, 97 S.Ct. at 548–49. "Unlike in *Ward* and *Tumey,* it is plain that the enforcing agent is in no sense financially dependent on the maintenance of a high level of penalties." *Id.* at 251, 100 S.Ct. at 1617. Most recently, the Court acknowledged the "possible temptation" standard in holding that a state supreme court justice had a "direct, personal, substantial, pecuniary" interest under *Ward, Tumey* and *Murchison,* when he participated in a decision on insurance law that had the effect of enhancing the legal status and settlement value of a class action he had filed against an insurance company. *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). At the same time, however, the Court reiterated that not every question of judicial qualification affords a basis for imposing a constitutional requirement under the Due Process Clause, *id.* at 820–21, 106 S.Ct. at 1584–85 (quoting *Tumey,* 273 U.S. at 523, 47 S.Ct. at 441), and declined to hold that allegations of general bias and prejudice suffice. It also dismissed Aetna's due process challenge to participation in the decision by other justices who were members of the class, as nothing suggested that they knew about the class action and any interest that they might have had was "highly speculative and contingent." *Lavoie,* 475 U.S. at 826, 106 S.Ct. at 1588. "At some point, '[t]he biasing influence ... [will be] too remote and insubstantial to violate the constitutional constraints.'" *Id.* (quoting *Marshall,* 446 U.S. at 243, 100 S.Ct. at 1614).

### B

Kaipat argues that the situation with the Judicial Building Fund Act lies between *Tu-* *mey* and *Dugan* in that it does not involve the direct salary compensation benefit of *Tumey,* but does involve more than the complete lack of personal or work-related motivation in *Dugan.* He contends that *Ward* shows that due process can be violated through work-related partisan motivations even absent a direct, personal, substantial pecuniary interest. Kaipat emphasizes that he does not make a "bias and prejudice" argument, but rather maintains that the Judicial Building Fund Act impermissibly gives judges both a personal interest in the Fund, because completion of the Judicial Complex will improve their daily working conditions for the remainder of their terms, and "an official motive to convict and to graduate the fine" because the CNMI judiciary is dedicated to the development of the legal system in the CNMI and the CNMI needs the new judicial complex.

CNMI contends that this case is more like *Dugan* than *Tumey* since none of the judges has any direct, personal, substantial, pecuniary interest in the fine; no judge has any control over the Fund; the judges' salary is fixed by statute and is paid without regard to fines; judges have no executive functions, only judicial functions; judges are not responsible for raising revenue; and the average judge would not be tempted by the possibility that the Governor will someday spend the Fund along with other monies on a judicial complex.

As the Court has recognized, when a judge's interest in the outcome of a case is constitutionally disqualifying cannot be defined with any precision. However, the circumstances and relationships involved here indicate that the superior court judge who imposed Kaipat's fine had no "direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case." *Tumey,* 273 U.S. at 523, 47 S.Ct. at 441. Neither the salary nor tenure of any CNMI judge is affected by the rate at which defendants are convicted or fined. 1 CMC §§ 3304, 3302. Judges receive their compensation whether they convict or acquit, fine or don't fine. That compensation is fixed and does not fluctuate. CNMI judges are just

judges; they have no other governmental position, and no executive responsibilities. Their functions are entirely judicial. In this respect, they are very much like the officials in *Dugan*.

To be sure, judges are only human and (along with the public, litigants and attorneys) will no doubt welcome courthouse facilities that are more comfortable, efficient and secure—if and when they are built, and if the judges are still in office to serve in them. However, this kind of interest is too contingent and speculative and insubstantial to constitute the direct stake in the outcome of a case that is constitutionally infirm.

Unlike the mayor of North College Hill in *Tumey* and the mayor of Monroeville in *Ward*, CNMI judges have no responsibility for the financial condition of the Northern Mariana Islands and no official motive to improve it. The legislature, not any judge in any capacity, has the duty of raising and appropriating funds for all government operations, including the courts. Nor is the CNMI superior court a special court (like the Ohio liquor courts), set up to enforce a specific law (like the Prohibition Act); the courts will exist whether or not persons accused of traffic offenses are prosecuted, tried, convicted, sentenced, or fined. Nor do CNMI judges hold any other position that permits them to control municipal or state policy with respect to establishing courts and enforcing particular laws, or which gives to them any interest in accumulating a fund by which other obligations (like the mayor's in *Tumey* of making village improvements and reducing taxes) could be met.

However, CNMI judges, as judges, undeniably do have, and perhaps inherently by virtue of their positions should have, an interest in adequate facilities for the administration of justice. The question is, does this become a *constitutionally* disqualifying interest if the legislature has decided to earmark funds that come into the general treasury from fees and fines imposed in all cases, civil and criminal, for judicial facilities? For a number of reasons, we cannot believe that any judge would impose an unjustified or unreasonable fine to increase the odds that enough money would be collected overall to build a courthouse.

In general, all criminal and civil fees and fines collected by Commonwealth courts go to the Commonwealth treasury. 1 CMC § 3251. In 1990 the Legislature decided to earmark these particular sources for courthouse construction. Apart from the fact that there is a certain users' logic to this decision, the legislature could just as easily have decided, or for all that appears in the record, could decide at any time, to earmark these same fees and fines for a new state capitol, for victims of crime, for health care, for prosecuting people who run red lights, or for any other purpose that the political branches deem worthy. As *Tumey* makes clear, "it is completely within the power of the legislature to dispose of the fines collected in criminal cases as it will . . ." *Tumey*, 273 U.S. at 534–35, 47 S.Ct. at 445. What it may not do is vest "the judicial power in one who by reason of his interest, both as an individual and as chief executive of the village, is disqualified to exercise it in the trial of the defendant." *Id.* at 535, 47 S.Ct. at 445.

This is not the case here. While the Chief Justice of the CNMI Supreme Court, as the administrative head of the judiciary, submits budget requests and is consulted by the Governor on matters having to do with the judicial branch (including construction of the new judicial complex), 1 CMC §§ 3401, 3402, 3405(c), no judge has any responsibility for or control over monies in the Judicial Building Fund. Expenditures from that Fund, including when or whether there are any, and for what kind of improvement, are up to the Governor.

Although the fine in any individual case is certainly consequential to the person having to pay it, the fact that it and all other fines are earmarked for courthouse construction does not make them consequential to the judges in rendering their judicial decisions. It is not reasonable to assume that a CNMI judge might be tempted to impose a fine, or to impose a higher fine, to enhance the prospects of building a building or building a building sooner rather than later. Not only does the judge have no control over whether or when or how the monies in the Fund are

spent, but as the legislature found in 1994, the cost of a new judicial complex for which funds were earmarked in 1990 will be plus or minus $15 million. Even in 1994, fees and fines were not expected to yield more than $700,000–800,000 per year. In addition, the 1990 Act itself indicates that monies from other sources could be used for judicial building improvements; in fact, they were.[10]

Therefore, by contrast with *Tumey* and *Ward*, and by comparison with *Dugan*, Kaipat has failed to show that the judge's situation is one "which would offer a possible temptation to the average man as a judge," *Tumey*, 273 U.S. at 532, 47 S.Ct. at 444, or that the judge has a strong, official motive stemming from an interest apart from his judicial functions, that necessarily involves a lack of due process in convicting or sentencing defendants charged with crimes in his court, *id.* at 534, 47 S.Ct. at 445.

For these reasons we conclude that Kaipat's right to due process was not violated.

AFFIRMED.

---

**10.** Although the trial judge did not know that other funds would actually be used at the time of Kaipat's sentence, he did before he rendered his decision on Kaipat's motion to reconsider the fine as the Judicial Building Financing Act of 1994 had been enacted by then.