(95 P.3d 1012)

No. 90,988

TRI-COUNTY CONCERNED CITIZENS, INC., *et al.*, *Appellees*, v. BOARD OF COUNTY COMMISSIONERS OF HARPER COUNTY, *Defendant*, and WASTE CONNECTIONS OF KANSAS, INC., *Appellant*.

Opinion filed August 20, 2004.

*John Terry Moore*, of Moore Martin, L.C., of Wichita, *N. Russell Hazlewood*, of counsel, of the same firm, and *Robert H. Epstein*, of Gallop, Johnson & Neuman, L.C., of St. Louis, Missouri, for appellant.

*John E. Foulston* and *Jeffrey R. Emerson*, of Foulston Conlee Schmidt & Emerson, L.L.P., of Wichita, for appellees Tri-County Concerned Citizens, Inc. *et al.*

Before GREENE, P.J., McANANY, J., and BRAZIL, S.J.

GREENE, J.: Intervenor Waste Connections of Kansas, Inc. (WCKI) and the Board of Harper County Commissioners (Board)

appealed the district court's order setting aside a special use permit for a sanitary landfill at the Plum Thicket site in Harper County based on a finding that the Board had prejudged the application of WCKI. After the appeal was filed, the Board withdrew its appeal. WCKI argues that the plaintiffs, including Tri-County Concerned Citizens, Inc. (Concerned Citizens), had no standing to challenge the Board's decision and that the district court erred in concluding that the Board had prejudged the application. We conclude that plaintiffs had legal standing, but we reverse the district court's findings and conclusions as to prejudgment of the Board.

### *Factual and Procedural Overview*

After WCKI was unsuccessful in obtaining permission to build a sanitary landfill in Sedgwick, Marion, and Greenwood Counties, county personnel came to the Board with an idea to consider situating the landfill in Harper County. The Board referred these personnel to the County's Economic Development Council (EDC), which first considered the idea at its October 11, 2000, meeting. As a result of that meeting, EDC wrote WCKI in November 2000 and urged it to consider a site in Harper County.

On January 24, 2001, Board Commissioner Sidney Burkholder attended an EDC meeting, wherein WCKI presented a proposed host agreement outlining the economic benefits to the County of hosting a landfill. Burkholder examined the proposed agreement, retained a copy, mentioned it to other commissioners, but discussed no details at that time. Shortly after this meeting, Burkholder contacted for potential legal assistance Shook, Hardy & Bacon, L.L.P. (SHB), which already provided legal services for the County pursuant to Kansas County Association Multiline Pool (KCAMP). On February 8, 2001, Burkholder transmitted to SHB a copy of the proposed host agreement, requesting that SHB "look at it to see if they had any suggestions." On February 17, 2001, the EDC recommended to the Board the proposed host agreement with a number of alterations and recommended that legal counsel be retained for review of the agreement. As of this date, no specific site had been proposed for the landfill.

From February 2001 until May 15, 2001, Burkholder had several communications with attorneys at SHB regarding applicability of the Kansas Open Meetings Act, the proposed host agreement, potential problems achieving permission under or amending the Gyp Hills Regional Solid Waste Authority's Waste Management Plan (Gyp Hills Plan), zoning issues, and the proper sequence of procedural steps. On May 15, 2001, SHB proposed and Burkholder accepted a formal engagement letter detailing the following scope of representation regarding the "potential new landfill":

"Assist with contract negotiations between Harper County and Waste Connections of Kansas, Inc.;

"Assist with relevant zoning matters;

"Assist with issues relating to the Kansas Open Meetings Act; and Assist with relevant environmental issues."

An SHB attorney later explained the purpose of the representation as "to assist with contract negotiations once the decision on a new landfill goes from potential to actual."

Another SHB attorney wrote a letter to Burkholder dated May 15, 2001. The letter referenced the following purpose: "You requested last week that I review the interlocal agreement for the Gyp Hills Solid Waste Region . . . to determine if there would be any issues with Harper County's approval of a new landfill to be operated by Waste Connections of Kansas, Inc." Because the Gyp Hills Agreement did not permit Harper County to compete with the regional plan, the letter described four options for proceeding with a landfill within the framework of the Gyp Hills Agreement. The attorney concluded the letter by notifying Burkholder that SHB would "be happy to help Harper County work through this issue, regardless of which option the county commissioners deem is most appropriate."

No formal site had been identified in Harper County for the landfill until May 7, 2001, when a formal application for a special use permit was filed by WCKI for the "Vavra" site. All three commissioners met with legal representatives twice in late May and early June to discuss the Gyp Hill Plan, the Kansas Department of Health and Environment (KDHE) permit, and certifications required, including a zoning certification. Apparently, due to envi-

ronmental concerns, the Vavra application was ultimately abandoned, and on July 12, 2001, WCKI submitted a special use application for the Plum Thicket site. Thereafter and until October 9, 2001, the Harper County Planning Commission (HCPC) conducted numerous public hearings, all of which were attended by all three commissioners. At these hearings, representatives of WCKI and KDHE appeared, and many County residents spoke against the landfill, largely alleging environmental concerns. On October 9, 2001, the HCPC recommended denial of the application for a special use permit.

Following the action of the HCPC, the application was referred to the Board, which conducted further public hearings and reviewed the extensive record from the HCPC proceedings. After these proceedings, the Board prepared for final consideration a "Special Use Revised Report" (the Report) dated March 4, 2002, and on March 5, 2002, the Report was approved unanimously. In granting the special use application for the Plum Thicket site, the Board explained the difference between the HCPC's recommendation and the Board's action:

"The County Commission, in considering the 17 factors [adapted from *Golden v. City of Overland Park*, 224 Kan. 591, 584 P.2d 130 (1978)], took into account the conditions that are made a part of these findings and decisions that are set forth in Section IV herein. These conditions were not considered by the Planning Commission. The County Commission, to a large degree, relied on the conditions when the County Commission came to different conclusions than the Planning Commission's conclusions as to the 17 factors and to its decision to grant the Special Uses requested."

On April 1, 2002, Concerned Citizens, along with six individuals, filed this action challenging the Board's decision. After a bench trial, the district court denied relief to Concerned Citizens, holding that the commissioners maintained "an open mind and continued to listen to all the evidence presented before making the final decision." On February 6, 2003, Concerned Citizens filed a posttrial motion alleging that newly discovered evidence merited a new trial. The new evidence consisted primarily of the entirety of the SHB files, which were produced after a reconstituted Board waived attorney-client privilege. The court conducted an evidentiary hearing

on the motion and ultimately reversed its prior order and set aside the special use permit, finding that "the cart got a little ahead of the horse."

WCKI and the Board appealed, but the Board withdrew its appeal prior to briefing.

## Standard of Review

WCKI's challenge to plaintiffs' standing to sue requires that we construe and apply K.S.A. 12-760. Interpretation of a statute is a question of law, and an appellate court's review is unlimited. *Williamson v. City of Hays*, 275 Kan. 300, 305, 64 P.3d 364 (2003). To the extent the district court's decision on standing was based upon findings of fact, we must determine whether the district court's findings are supported by substantial competent evidence. *Fusaro v. First Family Mtg. Corp.* 257 Kan. 794, 804, 897 P.2d 123 (1995).

In contrast, WCKI's challenge to the Board's zoning decision requires a review based upon the same standards applicable in district court. Our Supreme Court in *Combined Investment Co. v. Board of Butler County Comm'rs*, 227 Kan. 17, 28, 605 P.2d 533 (1980), summarized the applicable standard of review when determining the reasonableness of zoning ordinances or regulations and stated that "[a]n appellate court must make the same review of the zoning authority's action as did the district court." In *Johnson County Water Dist. No. 1 v. City of Kansas City*, 255 Kan. 183, 184, 871 P.2d 1256 (1994), the court held that the *Combined Investment* standards apply to special use permit decisions. Finally, in *McPherson Landfill, Inc., v. Board of Shawnee County Comm'rs.*, 274 Kan. 303, 304-05, 49 P.3d 522 (2002), the court applied these same standards in reviewing a zoning decision for alleged prejudgment by decisionmakers.

## Do Plaintiffs Have Standing to Sue?

Standing to sue means that a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy. *Dutoit v. Board of County Commr's.*, 233 Kan. 995, 1003, 667 P.2d 879 (1983). WCKI argues that Concerned

Citizens and the named individual plaintiffs do not have standing under K.S.A. 12-760 because they have not shown an invasion of an individual right. The statute vests standing in "any person aggrieved," providing:

"Within 30 days of the final decision of the city or county, *any person aggrieved thereby* may maintain an action in the district court of the county to determine the reasonableness of such final decision." (Emphasis added.)

In construing this statute we are assisted by the Supreme Court's decision in *Fairfax Drainage District v. City of Kansas City*, 190 Kan. 308, 314-15, 374 P.2d 35 (1962), where the court approved the following definition of "aggrieved":

" 'A party is aggrieved whose legal right is invaded by an act complained of or whose pecuniary interest is directly affected by the order. The term refers to a substantial grievance, a denial of some personal or property right, or the imposition upon a party of some burden or obligation. In this sense it does not refer to persons who may happen to entertain desires on the subject, but only to those who have rights which may be enforced at law and whose pecuniary interest may be affected. [Citations omitted.]' "

In addition to these judicial criteria to determine "persons aggrieved," we agree with the district court that "the larger a project is, the more sensitive it is to the community at large," thus expanding the universe of potentially aggrieved persons.

In the case of an association such as Concerned Citizens, we employ a three-part test in determining whether an association has standing to sue on behalf of its members: (1) the members must have standing to sue individually; (2) the interests the association seeks to protect must be germane to the organization's stated purpose; and (3) neither the claim asserted nor the relief requested require participation of individual members. *NEA-Coffeyville v. U.S.D. No. 445*, 268 Kan. 384, 387, 996 P.2d 821 (2000).

Applying these various criteria, we are convinced that Concerned Citizens has standing to challenge the zoning decision. It is beyond question that WCKI's application generated significant public interest due to perceptions that the project had major implications for the County. Moreover, Concerned Citizens appears to have fulfilled all the requirements for standing: (1) The individual members of the association have standing in their individual

capacity since they live within 1,000 feet of the landfill; property owners this close to a landfill site are aggrieved because they potentially suffer a substantial grievance and a loss of a pecuniary interest. (2) Since the stated purpose of the corporation is to protect the environment, the prosecution of this lawsuit is wholly consistent with the association's purpose. (3) The participation of the individual members is not necessarily required.

We conclude that the district court did not err in rejecting the challenge to plaintiffs' standing to maintain this action.

### *Did the District Err in Concluding That the Board Prejudged WCKI's Application?*

Concerned Citizens argues and the district court ultimately concluded that the prejudgment of the Board members on the merits of WCKI's application precluded a fair and impartial proceeding and rendered the resulting special use permit void. Specific allegations of prejudgment were directed at two of the commissioners; Commissioner Burkholder is accused of prejudging the application due to his actions in exploring the feasibility of a landfill and his interest in addressing the financial needs of the County through a landfill. Commissioner Williams is accused of prejudging the application due to his statements that by the time of the final vote on the application, he thought he "had no choice." We have concluded that neither commissioner's statements or actions demonstrated prejudgment of the application.

#### *Legal Standards to Determine Prejudgment*

Local governing bodies, including boards of county commissioners, necessarily have some duties that are legislative, some that are executive, and some that are quasi-judicial. Our Supreme Court has acknowledged that when the focus of such a governing body "shifts" from legislative policy or executive duty to a zoning determination as to one specific tract of land, the function becomes quasi-judicial in nature. See *Golden v. City of Overland Park*, 224 Kan. 591, 597, 584 P.2d 130 (1978). When this "shift" in function occurs, the requirements of due process attach, and the proceeding must be fair, open, and impartial. If these due process require-

ments are not fulfilled, the resulting action is void. *Suburban Medical Center v. Olathe Community Hosp.*, 226 Kan. 320, 330, 597 P.2d 654 (1979).

The Kansas Supreme Court considered prejudgment allegations in *McPherson Landfill* and held that prejudgment statements by a decisionmaker are not fatal to the validity of a zoning determination "as long as the statement[s] [do] not preclude the finding that the decisionmaker maintained an open mind and continued to listen to all the evidence presented before making the final decision." 274 Kan. at 318. The court cited with apparent approval *Madison River R.V. Ltd. v. Town of Ennis*, 298 Mont. 91, 94, 994 P.2d 1098 (2000), where the Montana court held that to prevail on a claim of prejudice or bias against an administrative decisionmaker, a petitioner must show that the decisionmaker has an " 'irrevocably closed' mind" on the subject under investigation or adjudication. Also cited with approval was *Wagner v. Jackson Cty. Bd. of Zon. Adj.*, 857 S.W.2d 285, 289 (Mo. App. 1993), where the Missouri court held that

"familiarity with the adjudicative facts of a particular case, even to the point of having reached a tentative conclusion prior to the hearing, does not necessarily disqualify an administrative decisionmaker, in the absence of a showing that the decisionmaker is not capable of judging a particular controversy fairly on the basis of its own circumstances."

With these legal standards in mind, we analyze de novo the evidence adduced against Commissioners Burkholder and Williams in the same fashion as did the Supreme Court in *McPherson Landfill*. We focus only upon these commissioners since Concerned Citizens apparently makes no specific claim of prejudgment against Commissioner Robert Sharp, other than to suggest that he participated with other commissioners in certain pre-application feasibility exploration.

### Commissioner Burkholder

Burkholder was the chairman of the Board at all material times, and his actions were a focus of the district court. Burkholder was present at the early EDC meetings and was among the first to examine WCKI's proposed host agreement. It was Burkholder who

first contacted SHB, provided a copy of the proposed agreement, and discussed numerous issues with SHB attorneys, including applicability of the Kansas Open Meetings Act, the Gyp Hills Plan, the proposed host agreement, and zoning concerns. SHB addressed its engagement letter to Burkholder, and he executed it "on behalf of Harper County, Kansas." With regard to these preapplication events, the record reveals nothing to indicate that Burkholder was acting outside his authority or that he was not acting in a manner consistent with the desires of his fellow commissioners.

Concerned Citizens argues on appeal that Burkholder's bias or prejudgment was based upon his motivation to solve the County's financial woes with revenues from the landfill. According to Concerned Citizens,

"Harper County was in devastating financial shape. It lacked funding for roads, bridges or even equipment. In the words of one witness, it would have been political suicide to raise taxes. Burkholder, Chairman of the Board having full and direct responsibility for Harper County's fiscal health, saw a way to solve a financial crisis impacting his institution. When Waste, Inc. dangled the monetary bait - he bit."

The district court expressed concern over Burkholder's involvement "early in 2001," stating:

"In this instance, the cart got a little ahead of the horse. The issues appropriately before the County Commission early in 2001 should have been related to sitting as a board of zoning appeals rather than terms of a host agreement, the expected income stream from the host agreement and whether the county was limited by the terms of the Gyp Hills regional government agreement. In theory the Board of Zoning Appeals is not concerned with financial benefits of a solid waste host agreement. The substantial discussions regarding the host agreement, potential income stream and Gyp Hills agreement as reflected in the Shook, Hardy and Bacon file in the first half of 2001 causes the Court great concern when resolving the plaintiff's claim of prejudgment/denial of due process when the Commissioners ultimately sat as a Board of Zoning Appeals."

For two reasons, we fundamentally disagree that Burkholder's preapplication concern and interest in fully exploring the feasibility of a landfill for the County adequately supports a finding of fatal prejudgment: (i) the nature of Burkholder's actions in determining general feasibility of a landfill were consistent with his executive or legislative duties as a commissioner and should not be consid-

ered as evidence of prejudgment of the subsequent special use application; and (ii) the timing of Burkholder's actions, predating any site selection and filing of the zoning application, was prior to any required "shift" to a quasi-judicial rule and not necessarily material to any prejudgment of the subsequent application. In the vernacular of the district court, we disagree with the conclusion that the zoning decision was required to be the "horse" before the "cart" of exploring general feasibility of a landfill project.

*First*, we note—as did the district court—that there is indeed an inherent conflict between the commissioners' roles as executive/ legislative officers concerned with financial and budgetary issues, and their roles as members of a quasi-judicial board of zoning appeals. Caution must be exercised in examining the actions of officials who serve with dual responsibilities.

"[M]ere evidence that a zoning official has a particular political view or general opinion about a given issue will generally not suffice to show bias. Courts recognize that public officials have opinions like everyone else and inevitably hold particular political views related to their public office. In fact, zoning official are typically chose to serve in their official capacity because they are expected to represent certain views about local land use planning and development." Dennison, *Zoning: Proof of Bias or Conflict of Interest in Zoning Decisions*, 32 Am Jur. Proof of Facts 3d 531, § 15, p. 559.

As another commentator has admonished,

"[d]ecisionmakers will inevitably have some bias regarding land development which will likely affect a decision. Moreover, opinion on land use serves to reflect community values and preferences regarding land development. For these reasons the inevitable predispositions that members of lay boards might have to particular decisions generally should be tolerated." Cordes, *Policing Bias and Conflicts of Interest in Zoning Decisionmaking*, 65 N.D. L. Rev. 161, 208 (1989).

Burkholder's motivation, opinions, and actions as an elected political representative of the County regarding the need to fully explore feasibility of a landfill and determine the sequence of appropriate procedural steps, including retention of counsel, were consistent with his legislative/executive duties. When viewed from this perspective, such actions were entirely innocent—if not laudable—and must be legally distinguished from any self-interest in determining any prejudgment of a special use application.

Concerned Citizens cites a number of cases involving due process challenges to the assessment of fines and penalties due to prejudgment by government officials acting in judicial capacities. See *Ward v. Village of Monroeville*, 409 U.S. 57, 34 L. Ed. 2d 267, 93 S. Ct. 80 (1972); *Tumey v. Ohio*, 273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437 (1927); *AEP Chapter Housing Ass'n v. City of Berkeley*, 114 F.3d 840 (9th Cir. 1997); and *Com. of Northern Mariana Islands v. Kaipat*, 94 F.3d 574 (9th Cir. 1996). These cases, however, are readily distinguishable from the present situation, where the alleged "financial interest" giving rise to prejudgment is the more attenuated potential for increased revenue streams to the County at large from the operation of a landfill.

*Second*, Burkholder's actions that occurred prior to the date of any site selection and the filing of the special use permit application predate his need to "shift" to a quasi-judicial role. Due in large part to the timing or sequence of Burkholder's actions under these circumstances, we conclude that actions taken to explore feasibility and potential economic benefits of a particular special use are not necessarily indicative of prejudgment of a *subsequent* special use zoning application, and they do not preclude a finding that the decisionmaker maintained an open mind and listened to all the evidence presented before making the final decision. See *McPherson Landfill*, 274 Kan. at 318; *Wagner*, 857 S.W.2d at 289.

After WCKI's formal application for the Plum Thicket site was filed on July 12, 2001, the overwhelming evidence supports Burkholder's impartiality. Burkholder attended each of the HCPC's public hearings and vigorously denied that he had prejudged the application as of the start of those hearings.

"Q. Prior to that time had you in any way made up your mind in regards to whether a special use should or should not be issued?
"A. No, I had not made up my mind."

Following the HCPC's action on the application, and upon referral of the matter to the Board, Burkholder persisted in denying any partiality.

"Q. Once it was referred to the County Commission did you continue to have a fair and impartial open mind in regards to this matter?

"A. Yes, I did.
"Q. Did you makeup your mind prior to March 5th?
"A. No.
"Q. When did you makeup your mind?
"A. Well, some of that decision making process goes on when you do the deliberations, but you start forming your ideas and the decision I felt came that day on March the 5th."

We acknowledge the concern of the district court that self-serving testimony of an official maintaining that he "kept an open mind" or "listened to the evidence" can be overcome by contrary statements or actions. Here, however, Concerned Citizens and the district court focused upon actions that predated the formal application; no significant actions manifesting prejudgment have been cited as occurring after the site was selected and the quasi-judicial proceedings began. Moreover, the self-serving testimony cited above is wholly consistent with the undisputed testimony that the official attended each and every public hearing, apparently with genuine interest. Although Burkholder stated that sometimes the persistent phone calls and messages from opponents were perceived as "harassment," we ascribe no legal materiality to this perception.

Finally, we note that the district court erred in attributing the perceived impropriety of Burkholder to the other commissioners. The rule in Kansas is that impropriety of one member of a quasi-judicial body may not be imputed to the entire body.

"It is also the rule that where the required majority exists without the vote of the disqualified member, his presence and vote will not invalidate the result and further that a majority vote need not be invalidated where the interest of a member is general or of a minor character. [Citations omitted.]" *Anderson v. City of Parsons,* 209 Kan. 337, 342, 496 P.2d 1333 (1972).

For all these reasons, we conclude that the district court erred in determining that Burkholder prejudged WCKI's application for a special use permit and that his perceived prejudgment contaminated the other commissioners and invalidated the Board's proceedings.

### Commissioner Williams

Williams testified in the initial trial that he had listened to all of the evidence presented at the public hearings before making a decision.

"A. Yes, sir, I did, but I tried to listen to the pros and the ones that were against it. I tried to so I could evaluate it. I tried to follow the law, give each side equal consideration and I knew that I was going to have people disagree with me either way I went. That's the reason I tried to carry out the law. That's the reason we hired a consultant that's been in the business 27 years to guide us. We also hired legal advice and we tried to follow it to the letter of the law and give both sides fair, as fair a chance as — and then the way it came down by the letter of the law, ahh, if it had been any other applicant I would do the same thing, too, sir."

The only allegation of Williams' prejudgment is based upon testimony from the rehearing.

"Q. I want to make clear I understand this so that the Court is clear as well. You felt that if the applicant agreed to conditions that you had to approve it or you would be breaking the law?

"A. That's the way I look at it. Otherwise, why would you have — why would you have any laws, or any rules?

"Q. Were you ever told any specific laws that you would be — the Commission would be breaking in that scenario?

"A. Well, if they met all the conditions and the way I understand the zoning law, ahh, if they meet all the conditions, ahh, why do we have a zoning law if we're not going to carry out the law? So, yes, I would be breaking it if they met all the conditions."

Based upon the testimony of Williams, the district court adopted Concerned Citizen's proposed finding that Williams failed to consider any evidence beyond the question of whether WCKI met the conditions set forth in the Report:

"A county commission acting as a Board of Zoning Appeals is not obligated to grant a requested change if the paperwork is done properly. Commissioner Williams felt he would have been 'breaking the law' had he voted against the Waste Connections zoning application because Waste Connections had agreed to conditions. Sitting in a quasi-judicial capacity, Commissioner Williams made a clear error of law that compelled him to consider *only* whether those conditions were agreed to. As such, he failed to consider the evidence presented during the hearings conducted at Chaparral High School."

We agree that Williams' testimony is somewhat troubling, but we decline to construe his comments as fatal prejudgment, given the time frame referenced by the comments. Based upon Williams' reference to the "conditions" that were set forth in the Report, we interpret his statements as reflective that his decision was made at

some time after the Report had been prepared but prior to the final vote thereon. From our review of the Report, it is clear that as of its preparation, all of the evidence adduced at the public hearings had been considered and referenced therein, all 17 factors (adapted from *Golden v. City of Overland Park*, 224 Kan. 591, 584 P.2d 130 [1978], and required to be considered by the County zoning regulations) had been considered and addressed specifically, and 43 conditions had been imposed upon the applicant (WCKI) to "address potential injurious effects, some of which were identified by the Planning Commission." The Report links the conditions established with the *Golden* factors as follows:

"If significant environmental concerns of the public can be appropriately reduced or eliminated by attaching stringent conditions to the Special Uses requested in order to make them more compatible land uses, then the relative gain to the public health, safety, and general welfare does not outweigh the loss in value or hardship imposed upon the Applicants by not approving the special uses."

Williams may not have been legally correct to say that he "had no choice" and that he would have been "breaking the law" had he voted against the application at this time, but we decline to construe his comments as evidencing fatal prejudgment. Decisionmaking is an evolving process, and due consideration of appropriate evidence and application of appropriate legal standards over the course of public hearings may properly enable the decisionmaker to form a reasoned decision prior to the moment of the final vote. The precise focus of a prejudgment inquiry must be the decisionmaker's state of mind as the evidence is presented, not when the evidence is subsequently discussed by decisionmakers and considered by them in forming a decision. For Commissioner Williams, by the time the Report was complete, setting forth extensive reference to and consideration of all required evidence, his mind was made up. He honestly felt that at that point it would be inappropriate and unwarranted to vote against the application. Expression of such sentiment is not necessarily prejudgment; indeed, although he may not have "broken the law" to vote against the application, we construe his posttrial testimony consistent with his trial testimony, where he maintained that his intent was to "follow the law" and "give each side equal consideration."

We conclude that the district court erred in finding that Williams' statements were adequate to conclude that he had fatally prejudged the application.

### *Summary and Conclusion*

We have not been asked to review the reasonableness of the special use application at issue herein. Our review has been limited to determining from the evidence whether purported prejudgment by the Board denied Concerned Citizens and others a fair and impartial consideration of WCKI's application and the opposition thereto. We have concluded that the evidence does not demonstrate that any of the commissioners exhibited an "irrevocably closed mind" on the issue before the Board. Although the commissioners' actions may not have proven politically popular, the evidence is insufficient to ascribe fatal prejudgment to any commissioner or to the Board's proceedings. The findings and conclusions of the district court are reversed, and the matter is remanded with directions to reinstate the special use permit.

Reversed and remanded with directions.