**ALPHA EPSILON PHI TAU CHAPTER HOUSING ASSOCIATION, a California corporation, Plaintiff–Appellant,**

v.

**CITY OF BERKELEY, a municipal corporation, and City of Berkeley Rent Stabilization Board, Defendants–Appellees.**

No. 96–15078.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1997.

Decided May 27, 1997.

Lawrence A. Gibbs, Grossman & Gibbs, Berkeley, CA, and Michael Ciraolo, Ciraolo & Ciraolo, Oakland, CA, for plaintiff-appellant.

Marjorie Gelb, Brian Kelly, Donald Tine, Manuela Albuquerque, Christine S. Daniel, Deputy City Attorneys, Berkeley, CA, for defendants–appellees.

Before: WHITE,[*] Associate Justice, Retired, and CANBY, and RYMER, Circuit Judges.

WHITE, Associate Justice, Retired:

The Berkeley Rent Stabilization Board wears two hats. In addition to performing executive functions such as setting rents and managing its budget, the Board serves in a quasi-judicial capacity. In this latter role, the Board adjudicates matters including whether landlords are covered by the local rent control ordinance and, hence, must pay registration fees (and possible penalties) into its coffers. The appellant, Alpha Epsilon Phi (AEP), contends that this dual responsibility violates due process. We hold that it does not.

## I. FACTS and PROCEDURAL HISTORY

The Berkeley Rent Stabilization Board is the creature and administrator of Berkeley's rent control ordinance. See The Rent Stabilization Act and Eviction for Good Cause Ordinance, B.M.C. § 13.76. Composed of nine members, the Board performs two primary categories of duties. In its executive capacity, the Board controls the rents that landlords may charge for properties subject to the ordinance, which covers all residential rental properties that do not fall under one of ten categorical exceptions, see B.M.C. § 13.76.050. This jurisdiction extends to approximately 18,500 units, varying slightly since 1988 from a low of approximately 18,300 to a high of about 18,850. The Board also administers its own budget, spending funds and hiring personnel to meet its mission. Importantly for this litigation, the Board is responsible for its own funding: it is directed to "finance its reasonable and neces-

sary expenses by charging landlords annual registration fees in amounts deemed reasonable by the board." B.M.C. § 13.76.060N. In addition, "when and if necessary" the Board is empowered to request funding from external sources such as the City of Berkeley. See id.

The practical result of this charter is that the entities that the Board regulates directly fund its operations. Consistent with the ordinance, the Board levies a per-unit registration fee to fund its annual expenses of approximately $2.4 million. In order to set the fee, the Board establishes its budget for the coming year, estimates how many units will be covered, and then sets the per-unit fee so that it will yield the budgeted amount. See App. at 129. The Board reviews this fee annually. In fiscal year 1994–95, the registration fee was $115 per unit; that amount increased to $125 in fiscal year 1995–96. In setting the fee in 1995–96, the Board weighed proposed amounts from $120 to $130 that, correspondingly, would have required different personnel decisions to stay on budget.

Because disputes arise over the Board's determinations, including coverage matters, the Board also serves an adjudicative function. Disputes are heard in the first instance by a hearing examiner, who finds facts and makes conclusions of law. Parties are then entitled to an appeal to the Board. If the Board determines that a rental unit is subject to rent control, the landlord must pay an annual registration fee as well as possible penalties for late payment. See B.M.C. § 13.76.080F. Disputes before the Board potentially implicating coverage determinations number about 35 per year.[1] Total budgeted penalty revenues with respect to registration in recent years have ranged from about $50,000 to $120,000 annually.[2] The Board also waives substantial amounts of penalties. For instance, in 1993–94 the Board waived $113,000 in penalties.

---

[*] The Honorable Byron R. White, Associate Justice of the United States Supreme Court, (Ret.), sitting by designation, pursuant to 28 U.S.C. § 294(a).

1. The record does not reveal how many of these cases the Board typically decides in favor of coverage.

2. The extent to which these penalties are imposed for nonregistration, as opposed to late registration, is not indicated in the record.

AEP operates a rooming house at the University of California, Berkeley. In 1984, when AEP was part of the national sorority, it, along with a number of other organizations, sued Berkeley for a determination that the rent control ordinance was unconstitutional as applied to those groups. The City and the parties stipulated to a dismissal whereby the City agreed not to subject the sororities to the ordinance in exchange for a promise that the sororities would comply with certain occupancy and rent conditions. In 1992, AEP severed its ties to the national organization.

In 1994, a resident of AEP filed a petition with the Board, alleging that the house was charging him excessive rents. Because AEP was no longer affiliated with the national sorority, the petitioner argued, it no longer satisfied the stipulated requirements and, therefore, was no longer eligible for the exemption from the rent control ordinance. The hearing examiner ruled in the tenant's favor. The Board affirmed, assessing a $125 registration fee and back fees and penalties for a total of $1,145. The Board also ordered AEP to refund rent overcharges to the petitioner and other tenants back to the date it severed its affiliation with the national sorority. AEP then filed suit in both federal and state court alleging a variety of violations, including the one relevant to this appeal: that under these circumstances the Board's determination violated due process because it was not an impartial adjudicator. AEP sought a declaration that the ordinance was unconstitutional, a permanent injunction barring the Board from applying the ordinance to it, and damages.

■ After dismissing most of the federal court claims on abstention grounds,[3] the district court granted summary judgment for the Board on the due process issue. The district court explained that "[t]wo types of bias have been recognized by the courts as violations of procedural due process: 1) where decision-makers gain personal financial benefits from their decisions (*Tumey v.*

*Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927)); and 2) where decision-makers have an institutional financial interest that may lead them to make biased decisions (*Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972))." *Alpha Epsilon Phi v. City of Berkeley,* No. C–95–0562 SI, slip op. at 6, 1995 WL 761257 (N.D.Cal. Dec.13, 1995). The situation in this case does not constitute the first type of bias, the district court explained, because "the facts are undisputed that no official at the Rent Board has any direct financial interest in the outcome of a particular hearing." *Id.* at 6–7. Turning to the institutional analysis, the district court held that the Board had no interest that could have violated due process because

> the Board's budget is not tied to the results of disputes as to whether a landlord must pay a registration fee. The Board sets its budget and then simply divides this amount by the number of landlords subject to the Rent Ordinance. Thus, if the number of landlords decreases, the registration fee for each land owner increases [and vice versa]. The important fact is that the Board's budget is set at a specific dollar amount and then the per-landlord fee is established by simple arithmetic. Thus, no Board official has competing interests between judicial and administrative concerns.

*Id.* at 7–8.

## II.  STANDARD OF REVIEW

■ We review a grant of summary judgment *de novo,* granting all reasonable inferences to the nonmoving party, in this case AEP. *See Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1994).

## III.  DISCUSSION

### A.

■ AEP argues that the Board's dual responsibilities violate due process. In AEP's view, the case is open and shut. This Court need only take account of two undis-

---

3. The state court has since ruled in favor of the Board. *See Alpha Epsilon Phi v. City of Berkeley Rent Stabilization Bd.,* No. 751723–7 (Cal.Sup.Ct. Feb. 7, 1997). This case remains an Article III

case or controversy, nonetheless, because the state court's rejection of AEP's biased decision-maker argument rested on the res judicata effect of the district court's decision. *See id.* at 2.

puted facts: "(1) Virtually the entire Rent Board budget is derived from registration fees it imposes on landlords[; and] (2)[t]he Rent Board itself adjudicates whether a landlord must pay these fees." AEP Br. at 10. This situation gives the Board a "pecuniary stake in the outcome of the litigation," AEP contends, which vitiates its status as "a disinterested and impartial adjudicator." *Id.* The Board also thinks this case is easy. Not surprisingly, the Board endorses the district court's rationale. The Board has *no* financial interest in the outcome of coverage disputes, it claims, because, if the number of covered units drops, it simply raises the registration fee to generate the necessary funds. *See* Board Br. at 8, 15–18.

■ We think this case somewhat more involved. A recent decision of this court—handed down after the briefs in this case were filed—provides an overview of the Supreme Court's numerous cases in this area. *See Commonwealth of N. Mariana Islands v. Kaipat,* 94 F.3d 574 (9th Cir.1996). *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), and its progeny establish two main categories of due process challenges based on structural bias. First, due process is violated if a decisionmaker has a "direct, personal, substantial pecuniary interest" in the proceedings. *Id.* at 523, 47 S.Ct. at 441. Second, even if the decisionmaker does not stand to gain personally, due process may also be offended where the decisionmaker, because of his institutional responsibilities, would have "so strong a motive" to rule in a way that would aid the institution. *Id.* at 532, 47 S.Ct. at 444.

We first note our disagreement with the district court's rationale for ruling in the Board's favor. In granting summary judgment, the district court relied on an assumption that adjudications added nothing to the Board's budget. *See Alpha Epsilon Phi,* slip op. at 6. The Board is indifferent to coverage determinations, the court reasoned, because it sets its budget and then divides by the number of covered properties to determine the applicable fee. *See id.* If the number of covered units drops, the Board simply increases the fee to yield the desired amount of revenue. *See id.*

The flaw in this logic is that the fee is established *prospectively* based on the *estimated* number of units that will be registered in the coming year. After that fee is established, every property subject to registration adds another payment of that fee amount to the Board's account for the year. Thus, every adjudication after the estimate has been met offers the Board the opportunity to go over budget, and, conversely, those adjudications before the estimate is met threaten the possibility of being under budget. It is reasonable to assume that institutions generally desire to meet their budgets, even self-imposed ones. Because this is a summary judgment, and consequently the inferences must be resolved in favor of AEP, we must assume that the Board had *some* financial interest in its coverage decisions.[4]

■ Conversely, we cannot agree with AEP's contention that *any* pecuniary interest in coverage adjudications nullifies the

---

4. We also are unimpressed with an alternative defense of the Board. Citing the balancing test of *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Board argues that due process was satisfied by the hearing examiner in the first instance even if the Board was biased; this is especially true, according to the Board, because further review is available in state court. This hardly comports with due process. The *Mathews* investigation for the *amount* of process that is due in a particular situation is a distinct inquiry from whether that process is *impartial. See Clements v. Airport Authority of Washoe County,* 69 F.3d 321, 333 (9th Cir.1995) ("A biased proceeding is not a procedurally adequate one."); *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.,* 787 F.2d 128, 137

(3d Cir.1986) ("A *Mathews* balancing test, however, is not the appropriate inquiry when the due process claim involves an allegation of biased decisionmakers."), *aff'd sub nom. Pension Ben. Guar. Corp. v. Yahn & McDonnell,* 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987); *cf. Ward,* 409 U.S. at 83, 84, 93 S.Ct. at 263, 264 ("Nor ... may the State's trial court procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication.... This 'procedural safeguard' does not guarantee a fair trial in the mayor's court."). On the Board's theory, our review of this case would not offend due process even if we received a large cash payment every time we reversed (but not when we affirmed) because the district court judge was unbiased and further review of our decision is available.

Board's ability to serve as an impartial adjudicator. In this appeal, AEP does not contend that the Board members have a personal stake in the outcome of their decision.[5] Rather, it argues that, because they have executive responsibility for their organization's finances, the Board members possess a strong *institutional* motive to rule against landlords who contend they are not covered by the ordinance. That AEP alleges institutional bias refutes its reliance on the Supreme Court's more stringent cases dealing with *personal* interest under prong one. *See, e.g., Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (due process violated when members of board with power to bar optometrists from practice had their own private practices in competition with those who came before the board); *Connally v. Georgia,* 429 U.S. 245, 97 S.Ct. 546, 50 L.Ed.2d 444 (1977) (due process violated when justice of the peace personally received $5 for each search warrant he issued, collected nothing when he denied a warrant, and had no other salary).

Nor does *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980), preclude a *de minimis* institutional interest as AEP insists. *Jerrico* held that "[t]he rigid requirements of *Tumey* and *Ward*" were not applicable in that case, which involved a challenge to a prosecutorial rather than a judicial function. *Id.* at 248, 100 S.Ct. at 1615 *Jerrico*'s description of the *Tumey/Ward* rule as "rigid" could not change the stated terms of that rule, especially when, by the decision's own terms, it was inapplicable in that case. And *Tumey* itself makes clear that some institutional interests will be too small to be of constitutional moment:

> It is, of course, so common to vest the mayor of villages with inferior judicial

functions that the mere union of the executive power and the judicial power in him cannot be said to violate due process of law. The minor penalties usually attaching to the ordinances of a village council, or to the misdemeanors in which the mayor may pronounce final judgment without a jury, do not involve any such addition to the revenue of the village as to justify the fear that the mayor would be influenced in his judicial judgment by that fact.

273 U.S. at 534, 47 S.Ct. at 445. Thus, as a threshold matter, AEP is incorrect that due process allows no *"de minimis"* exception in the institutional setting.[6]

## B.

■ Although AEP relies incorrectly on a *per se* rationale, we must nonetheless determine whether the Board's financial interest in its coverage adjudications is sufficiently large to offend the proper standard. We turn, then, to evaluate AEP's contention. Properly characterized, AEP's challenge falls under the second, institutional aspect of the due process analysis. Whether an institutional motive is "so strong" to violate due process is obviously a matter of degree. As set out in *Ward v. Village of Monroeville,* 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), the question is whether the situation is one

> which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused.

*Id.* at 60, 93 S.Ct. at 83 (quoting *Tumey,* 273 U.S. at 532, 47 S.Ct. at 444). As further described in *Kaipat,* the issue is whether the official motive is "strong," 94 F.3d at 582, so

---

5. AEP alludes to a personal bias contention in its complaint, *see* App. at 16, where it noted that the Board sets its own salaries. However, AEP does not make this argument on appeal. Given the tiny percentage of the Board budget that Board salaries constitute (about two percent), *see* App. at 129, and the absence of any evidence that budgetary constraints have any effect on the modest salaries the Board members have approved ($6,000 per member annually), *see id.,* "one could not seriously contend that the Board

members have a "direct, personal, substantial pecuniary interest" in coverage determinations."

6. Indeed, even the personal interest analysis of prong one contains a *de minimis* exemption. *See Aetna Life Insurance Co. v. Lavoie,* 475 U.S. 813, 826, 106 S.Ct. 1580, 1588, 89 L.Ed.2d 823 (1986) ("'[A]t some point, the biasing interest ... [will be] too remote and insubstantial to violate the constitutional constraints.'") (internal quotations omitted); *see also id.* at n. 3.

that it "reasonably warrant[s] fear of partisan influence on [the] judgment," *id.* at 575.

Viewed in the light most favorable to AEP, as it must for this summary judgment, the evidence establishes the following: (1) that the Board receives at least the $115–125 registration fee every time it adjudicates a rental unit covered by the ordinance, see App. at 130; (2) that Board adjudications over whether properties are covered and resulting penalty revenues have varied annually from approximately $50,000 to about $120,-000—or about two to five percent of the entire budget, *see id.* at 87; [7] and (3) that the Board has some price sensitivity to the amount it charges landlords and that each covered landlord offers the opportunity to marginally decrease the fee necessary to cover the budget (or the opportunity to increase staff or services) in future years, *see id.* at 111. On the other hand, it is undisputed that (1) the Board has run surpluses in recent years, *see id.* at 101; (2) the Board regularly waives large amounts of penalties, *see id.* at 81, 128; (3) only about 35 petitions a year challenge coverage issues (out of over 18,000 covered units), *see id.* at 128; [8] and (4) the number of covered units has not changed significantly over the years, *see id.* at 80, 129.

In determining whether this situation violates due process, we are guided by prior cases of the Supreme Court and this Court. No prior case, however, is quite on point. The Supreme Court, in *Ward,* 409 U.S. at 58, 93 S.Ct. at 82, found a due process violation where the income from fines was a "major part" of the village's income in that it constituted between one-third and one-half of the total budget. "This revenue was of such importance to the village," the Court noted, "that when legislation threatened its loss, the village retained a management consultant for advice upon the problem." *Id.* Similarly, in *Tumey,* 273 U.S. at 533, 47 S.Ct. at 444 official incentives were an alternative basis for finding a due process violation (in addition to personal incentives) where the fines collected for the village were unquantified but "substantial[ ]" in relation to the village's budget. In *Jerrico,* 446 U.S. at 250–52, 100 S.Ct. at 1616–18, administrative adjudication of child labor law violations did not violate due process where the amount of penalties the agency received were less than one percent of the total budget, the agency served a prosecutorial (rather than a judicial) role, and the agency ran a surplus.

This Court has also supplied some benchmarks. In *Hirsh v. Justices of Supreme Court of Cal.,* 67 F.3d 708, 713–14 (9th Cir. 1995), we held that the collection of approximately one percent of State Bar funds through the California Supreme Court's assessment of disciplinary fines did not violate due process.[9] And, in *Kaipat,* 94 F.3d at 581–82, due process was not violated where the Supreme Court of the Northern Mariana Islands levied fines that went into a fund to build a new courthouse. The judges were not responsible for the construction costs of the new building, the *Kaipat* panel explained, and the total collected from these fines was

7. This range gives every possible inference to AEP, testing the limits of reasonableness. It assumes (1) that every penalty imposed by the Board was for nonregistration instead of late registration (which, even if we make the further unlikely assumption that the Board decided every case in favor of coverage would require penalties of more than $3,400 per case), and (2) that none of the substantial penalties that the Board waives concerned registration.

8. According to AEP, this number understates the true impact of the ordinance because it does not "take into account the extent to which it deters landlords from contesting coverage claims." AEP Br. at 20 n. 5. But this contention puts the rabbit in the hat. AEP has produced no evidence (such as affidavits) that landlords are *in fact* deterred from challenging the applicability of the ordinance to their units. Instead, AEP relies on

the inference that landlords are deterred from contesting coverage because of the Board's dual responsibilities. This inference, of course, depends on the ultimate issue in this litigation: whether one could reasonably view the Board as biased.

9. *Hirsh* distinguished another case—*In re the Matter of Ross,* 99 Nev. 1, 656 P.2d 832 (1983)—on two grounds: (1) that the disciplinary fines in *Ross* were a "crucial source" of revenues for the state bar, and (2) that the Nevada adjudicators were responsible for the Bar's finances. 67 F.3d at 714 n. 3. This case presents a significant factor not present in *Hirsh:* the Rent Board *is* responsible for its finances. Nevertheless, the coverage adjudications (even including penalties) are not, in our view, a "crucial source" of the Board's revenues.

only about five percent of the budgeted costs. *Id.*

The situation at issue here falls somewhere in between the cases where the institutional incentives were sufficient to violate due process (*Tumey* and *Ward*) and those where they were not (*Jerrico, Hirsh,* and *Kaipat*). Viewed in the light most favorable to AEP, the amount of the budget at stake (conceivably up to five percent) is the same as in *Kaipat* and more than in *Jerrico* and *Hirsh.* Moreover, because the Board is directly responsible for its budget, this case presents a factor not present in any of those cases. On the other hand, the amount at stake is certainly far less than the one-third to one-half of the budget implicated in *Ward,* and it is presumably less than the "substantial[ ]" amount at issue in *Tumey.*[10]

The issue, in the end, comes down to a judgment whether the official motive here is "strong," *Kaipat,* 94 F.3d at 582, so that it "reasonably warrant[s] fear of partisan influence on [the] judgment." *Id.* at 575. Or, in the words of *Ward* and *Tumey,* the question is whether the incentives would "offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused." *Ward,* 409 U.S. at 60, 93 S.Ct. at 82 (quoting *Tumey,* 273 U.S. at 532, 47 S.Ct. at 444.)

In our judgment, the present situation does not cross this threshold. That the Board is both adjudicator of coverage and executor of its finances may be a less than optimal design for due process purposes. But even taking into account the highest penalty level listed on the financial statements for any year, and assuming that all of

those penalties were for nonregistration and that none were waived, the amount of the budget at stake in any year—at a maximum of five percent—is rather small. And, of course, if these maximum inferences exceed what is reasonable, the amount at issue is much smaller.

Moreover, though we disagree that the Board's budgetary system gave it *no* incentive to find landlords covered, it is true that the Board has authority to raise fees for the next year should it fall below budget in any particular year. We recognize that common sense political realities suggest—and the record indicates—that the Board is somewhat sensitive to raising fees. But this ability to recoup losses, combined with the Board's authority to seek funding from the City and other sources "when and if necessary," further attenuates the financial motivations of the Board.

Finally, even while steering clear of the weighing province of a factfinder, we must take note, in our legal evaluation, of the undisputed contrary evidence. The record in this case establishes that the Board rarely adjudicates coverage issues, regularly waives penalties, recently has run a surplus, and clearly has refrained from systematically expanding its dominion over ever-increasing numbers of properties.

### C.

Evaluating all the evidence, we determine that the Board's adjudication of coverage issues does not offend the applicable due process standard. The Board's motive to adjudicate landlords covered by the ordinance is not "strong." No person could "reasonably ... fear ... partisan influence in [the] judgment." And this situation would

---

10. Cases from other courts have found due process violations on facts that we read as less problematic than those at issue here. *See In re Matter of Ross,* 99 Nev. 1, 656 P.2d 832, 839 (1983) (due process violated when Nevada's Supreme Court generated "a very substantial portion" of its budget from attorney disciplinary adjudications); *Meyer v. Niles Tp., Ill.,* 477 F.Supp. 357, 362 & 362 n. 7 (N.D.Ill.1979) (due process violated when members of Public Aid Committee that determined when to pay medical benefits out of general township funds also had direct executive responsibility for those funds, which one Committee member had stated were inadequate to sustain all the township's obligations). In addition, the Seventh Circuit has found a facial due process violation in a case challenging a statute very different from the one at issue here. *See United Church of the Medical Center v. Medical Center Comm'n,* 689 F.2d 693, 700 (7th Cir.1982) (due process violated when Medical Center Commission, by adjudication, could revert valuable real property to itself without compensation, and keep the proceeds from any sale, even though substantial improvements had meanwhile been made to the property).

848

not pose a temptation to the "average man as judge" or induce him "not to hold the balance nice, clear, and true."

Indeed, we find these facts akin to *Tumey*'s own example of an institutional situation that would not offend due process: where "minor penalties ... attaching to the ordinances of a village council ... do not involve any such addition to the revenue of the village as to justify the fear that the mayor would be influenced in his judicial judgment by that fact." 273 U.S. at 53, 47 S.Ct. at 256. We hold that the Board has shown, as a matter of law, that its design does not deny due process.

The judgment of the district court is

*Affirmed.*