[No. B170613. Second Dist., Div. Eight. June 21, 2005.]

MARGARET JEAN McBRIDE et al., Plaintiffs and Appellants, v. CALIFORNIA BOARD OF ACCOUNTANCY, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of the part entitled The Statement of Decision.

**COUNSEL**

Hogan & Hartson, Sidney Davis and David Wertheimer for Plaintiff and Appellant Margaret J. McBride.

Wilke, Fleury, Hoffelt, Gould & Birney and Matthew W. Powell for Plaintiffs and Appellants Joseph H. Parker and Bradley J. Timon.

Bill Lockyer, Attorney General, Karen B. Chappelle, Jeanne C. Werner, Erlinda G. Shrenger, Linda L. Sun and Joseph N. Zimring, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**FLIER, J.**—The trial court sustained the decision of the California Board of Accountancy to discipline appellant members of the accounting profession for their failure to meet professional standards in performing audits for the County of Orange. We affirm.

### FACTS

Robert Citron, the elected treasurer-tax collector for Orange County, was authorized to invest Orange County funds and the funds of the "Orange County Investment Pool" (OCIP), which consisted of Orange County funds as well as funds on deposit from other governmental entities. In addition to funds deposited by school districts, which were required to invest their funds in OCIP, and other voluntary OCIP participants, Citron raised additional funds for OCIP by borrowing from brokers and lenders. Citron would transfer securities owned by OCIP as collateral for the cash, and promised to repay cash plus interest upon the return of the securities. This arrangement is called a reverse purchase agreement. Citron invested the cash obtained through these reverse purchase agreements in other securities.

As long as interest rates were stable or declining, the reverse purchase agreements enabled Citron to invest the borrowed funds at rates higher than were paid for the funds borrowed under the reverse purchase agreement. This yielded high rates of return for OCIP. Up to and including June 1993, both the portfolio of securities and the interest earned increased dramatically in value. By 1992–1993, Orange County had become more dependent on investment income for its budget.

The trouble started when interest rates began to rise in the early spring of 1994. Increasing interest rates led to collateral calls by lenders under the reverse purchase agreements, since the value of the securities posted as collateral declined as a result of rising interest rates. The value of OCIP's holdings also declined. On December 1, 1994, the county board of supervisors announced that the holdings had declined in value by 7 percent. On December 6, 1994, Orange County filed for bankruptcy protection and ultimately reported a loss of $1.6 billion for the year ending June 30, 1995, through the liquidation of most of its securities.

On April 17, 1995, Citron pleaded guilty to four felonies. Based on his plea of guilty, Citron was convicted of the following crimes: (1) using false statements in the sale of security, based upon his admissions that the "Statement of Investment Policy" and "1992–1993 Annual Financial Summary" were false and misleading; (2) misappropriation of public funds in

excess of $80 million of earned interest belonging to participants in the OCIP; (3) falsification and concealment of public accounts in that he mailed periodic earned interest statements which falsely stated the interest earnings of OCIP; and (4) unlawful failure to transfer public funds in that he failed to apportion interest derived from the investment of funds in the OCIP in an amount proportionate to the average daily balance of the amounts deposited by the participants.

## PROCEDURAL HISTORY

On December 8, 1998, respondent California Board of Accountancy (Board)[1] filed an accusation against KPMG LLP and Eric Freedman, and appellants Margaret Jean McBride, Joseph Horton Parker, and Bradley Jay Timon. Although the Board found good cause to discipline Freedman, in the interest of justice the Board did not impose discipline on Freedman, and he is not a party to this appeal. KPMG has abandoned its appeal.

The parties named in the accusation were certified public accountants licensed by the Board. KPMG is a "Big 4" international accounting firm that maintains 12 offices and employs approximately 2,100 professionals in California; the individual appellants were at the material times partners or employees of KPMG. KPMG performed the audits of the financial statements of the County of Orange for the fiscal years that ended in 1992 and 1993, and did not complete the audit for 1994. Orange County declared bankruptcy in December 1994. The accusation alleged that appellants had engaged in unprofessional conduct that was grossly negligent "in that the audit work contained extreme departures from applicable professional standards, including the more stringent standards for governmental audits."

The hearing on the Board's accusation before the administrative law judge (ALJ)[2] commenced on March 15, 2000, and was completed on December 29, 2000. The posthearing briefing was completed on June 18, 2001. Amicus curiae briefs were received, and the ALJ ruled on the admission of disputed exhibits. Over 5,000 exhibits were admitted into evidence; the administrative record is in 46 boxes. The matter was deemed submitted on January 9, 2002. The ALJ signed his decision on February 6, 2002. Under the authority of

---

[1] The Board is part of the California Department of Consumer Affairs and is composed of 15 members, seven of whom are certified public accountants licensed by the Board, the remainder being public members not licensed by the Board. (Bus. & Prof. Code, § 5000.)

[2] An administrative law judge is appointed by the director of the Office of Administrative Hearings, which is an agency of the Department of General Services. (Gov. Code, §§ 11370.2 & 11370.3.) The circumstance that the ALJ is independent of the Board is germane to part 1 of our Discussion (the imposition of prehearing costs does not violate due process), *post*.

Business and Professions Code section 5107,[3] the ALJ imposed an award of $1,814,678.90 for prehearing prosecution and investigation costs against KPMG. The ALJ's decision is 109 pages long.

The Board served notice under Government Code section 11517 that it did not adopt the ALJ's decision, and that it would decide the case upon the record, including the transcript of the hearing before the ALJ and such written argument as the parties chose to submit.[4] The Board thereafter handed down its decision, which substantially was the same that had been made and entered by the ALJ. The Board confirmed the award of $1,814,678.90 for prehearing costs against KMPG. Pursuant to subdivision (e) of Business and Professions Code section 5107, the Board found that it would be unduly punitive to impose the costs on the individual appellants and exempted them from paying any part of the costs assessed against KPMG.

The Board suspended KPMG's license for 30 days, but stayed the suspension and put KPMG on probation for one year. The ALJ had recommended a public reproval for KPMG. McBride's license was suspended for one year, and Parker's and Timon's licenses were suspended for 180 days. The suspensions were stayed, and probationary terms of three years were imposed on all three individuals.

Appellants filed a petition for a writ of mandate. Following a trial, the trial court denied the petition, issued a statement of decision, and entered judgment. This appeal followed.

## THE STATEMENT OF DECISION*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISCUSSION

1. *The Imposition of Prehearing Costs Does Not Violate Due Process and Does Not Invalidate the Board's Decision*

Citing *Tumey v. Ohio* (1927) 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437] and *Ward v. Village of Monroeville* (1972) 409 U.S. 57 [34 L.Ed.2d 267, 93

---

[3] See Discussion, part 1, *post*, for Business and Professions Code section 5107.

[4] Under subdivision (c) of Government Code section 11517 that was in effect until 1999, the agency had the option of "not adopting" the ALJ's decision. Under subdivision (c)(2)(E) of section 11517 enacted in 1999, the agency has the option of rejecting the proposed decision, and deciding the case upon the record, including the transcript, or upon an agreed statement of the parties, with or without taking additional evidence.

*See footnote, *ante*, page 518.

S.Ct. 80], appellants contend that due process was violated because an "adjudicator's institutional pecuniary interest in the outcome *may* tempt him not to be impartial." (Italics in original, boldface & capitalization omitted.) Appellants contend that the costs of approximately $1.8 million that KPMG is required to pay constitutes "nearly 17% of the Board's 2002–2003 total expenditures" and that this substantial award created an impermissible pecuniary interest on the Board's part in the outcome of this case.

The ALJ, as well as the Board, found that prior to the commencement of the hearing before the ALJ, the Board had incurred investigative and prosecutorial costs of $4,032,842. The factual bases for this figure are set forth at length in the ALJ's decision. Appellants do not claim that this sum is excessive or an inaccurate measure of the work that was done by the Board prior to the hearing before the ALJ.[6]

In arriving at the cost that was actually imposed, the ALJ and the Board concluded that three of the nine issues that were addressed in these proceedings were substantial in extent and scope. These issues were compliance with investment laws and regulations, market value disclosures and reporting, and interest revenue and allocation. The ALJ found[7] that the Board had prevailed on the major issue of compliance, and on five other lesser issues. The ALJ allocated 25 percent of prehearing costs to each of the three major issues, and the balance of 25 percent to the lesser issues. The ALJ found that, in light of these circumstances, the Board had prevailed on 45 percent of the case and he therefore allocated 45 percent of $4,032,842, or $1,814,678.90, as prehearing costs to be paid by KPMG.

■ "Of all the types of bias that can affect adjudication, pecuniary interest has long received the most unequivocal condemnation and the least forgiving scrutiny." (*Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, 1025 [119 Cal.Rptr.2d 341, 45 P.3d 280], citing inter alia *Tumey v. Ohio, supra,* 273 U.S. 510, & *Ward v. Village of Monroeville, supra,* 409 U.S. 57.) In *Tumey v. Ohio,* the court held that due process in the form of an impartial judge was denied when the judge received as part of his salary the costs that he imposed on a convicted defendant. (*Tumey v. Ohio, supra,* at pp. 533–534.) The result was the same in *Ward v. Village of Monroeville,* even though the fines imposed by the "mayor's court" did not benefit the mayor personally, but rather the municipality. The court held that the mayor's responsibilities for village finances "may make him partisan to maintain the high level of contribution from the mayor's court." (*Ward v. Village of*

---

[6] The Board characterized the effort to prepare this case for the hearing as a "massive undertaking" that required its personnel to review approximately 100,000 pages of "workpapers" contained in 46 boxes.

[7] The Board's disposition and decision of this issue was identical to that reached by the ALJ.

*Monroeville, supra*, at p. 60.) The California Supreme Court, applying *Tumey* and *Ward*, recently invalidated a decision reached by a temporary hearing officer whose reappointment by a county agency was dependent solely on the agency's goodwill. Since the county could prefer to make appointments of persons whose past decisions favored the county, the court held that such a temporary hearing officer had an impermissible pecuniary interest in the outcome of cases that were assigned to her. (*Haas v. County of San Bernardino, supra*, at p. 1029.)

Even though the adjudicator may not have a pecuniary interest in its decision, we find that two provisions of Business and Professions Code section 5107, the statute that authorizes and regulates the authority to assess reasonable costs of investigation and prosecution of the case, insulate the Board from any impermissible influences that might be generated by an award of prehearing costs.

■ Subdivision (a) of Business and Professions Code section 5107 provides that the executive officer of the Board "may request the administrative law judge, as part of the proposed decision in a disciplinary proceeding, to direct any holder of a permit or certificate found to have committed a violation or violations of this chapter to pay the board all reasonable costs of investigation and prosecution of the case, including, but not limited to, attorneys' fees. The board shall not recover costs incurred at the administrative hearing." Subdivision (c) of section 5107 provides that the administrative law judge shall make a proposed finding of the amount of reasonable costs of prosecution and investigation. Subdivision (d) states that "[t]he finding of the administrative law judge with regard to cost *shall not be reviewable by the board to increase the cost award.* The board may reduce or eliminate the cost award, or remand to the administrative law judge where the proposed decision fails to make a finding on costs requested by the executive officer pursuant to subdivision (a)." (Italics added.)

■ Appellants contend that the ALJ's authority is limited to making a "proposed" finding of the amount of reasonable costs of prosecution and investigation and that the ALJ's finding is "reviewable by the Board." The contrary is true. Business and Professions Code section 5107, subdivision (d) expressly deprives the Board of the power to review the award of costs, except to reduce or eliminate the award. From a practical perspective, this vests the decision on the question of costs in the ALJ, and not the Board, which is subordinated to the role of reducing or eliminating the cost award if it concludes that such a decision is warranted.

It appears therefore that the decision on the issue of prehearing costs is made by the ALJ. The Board is deprived of the power to review the decision,

with the exception that it may decrease the award. Other than decreasing or eliminating the cost award, the only power the Board has is to ratify the award that the ALJ has made.

That the ALJ's decision is not reviewable by the Board distinguishes this case from *AEP Chapter Housing Ass'n v. Berkeley* (9th Cir. 1997) 114 F.3d 840, 844, footnote 4, when the court *rejected* the argument that the impartiality of a hearing officer exempts an administrative agency that reviews the hearing officer's decision from the rule against an impermissible pecuniary interest. The hearing officer's decision in *AEP Chapter Housing* appears to have been freely reviewable by the administrative agency involved in that decision. (*Id.* at p. 842.) In light of subdivision (d) of Business and Professions Code section 5107, this is not true of the ALJ's decision regarding prehearing costs in this case.

■ The principle that a person cannot be subjected to the judgment of a court in which the judge "has a direct, personal, substantial, pecuniary interest in reaching a conclusion against [that person]" (*Tumey v. Ohio, supra,* 273 U.S. at p. 523) separates the pecuniary interest from the decision maker, i.e., the decision maker must not have a pecuniary interest in the decision. It is clear that the ALJ does not have a pecuniary interest in the costs that he may assess under the authority of Business and Professions Code section 5107. As noted, the ALJ is appointed by the director of the Office of Administrative Hearings, and derived no financial benefit from presiding over the administrative hearing. (Fn. 2, *ante.*)

The Board, in adopting the ALJ's decision, may also adopt the ALJ's decision on the issue of prehearing costs, as it did in this case. In this setting, the Board as a decision maker decides to affirm a cost award, which unites in one body the decision on the merits and the decision with pecuniary consequences. However, it is true that the ALJ's decision is free from the taint of pecuniary self-interest, since the ALJ does not have a pecuniary interest in the cost award, and that, from a practical perspective, the ALJ's decision to award costs is a final decision.

■ Second, it is also significant that subdivision (a) of Business and Professions Code section 5107 permits the recovery of certain prehearing costs, and *specifically prohibits the recovery of costs incurred at the administrative hearing.* As our Supreme Court has observed, "California law permits most agencies imposing discipline on licensed professionals to recover prehearing costs of investigation and prosecution. At least 30 other states and the territory of the United States Virgin Islands have similar provisions." (*Zuckerman v. State Bd. of Chiropractic Examiners* (2002) 29 Cal.4th 32, 41 [124 Cal.Rptr.2d 701, 53 P.3d 119], fn. omitted.) The vice of a decision

maker's pecuniary interest in the decision on the merits is that the decision itself may be influenced by the pecuniary interest. As noted by the court in *Zuckerman*, the national consensus appears to be that the recovery of prehearing costs is not a pecuniary interest in the decision itself.

2. *The Discipline Imposed on Appellants Is Not Predicated on the Finding That Appellants Did Not Disclose That the County's Investments Were Illegal*

Appellants contend that the "sole basis for the Superior Court's conclusions that Appellants failed to test the County's compliance with investment laws, failed to understand or evaluate the County's internal control structure; failed to gather sufficient evidential matter; and failed to supervise the audit, *was the Court's belief that the County's investments were illegal and that Appellants failed to discover and report that illegality.*" (Italics added.)

There are two flaws in this contention. First, appellant's rendering of the trial court's decision is an incorrect, and incomplete, characterization of the statement of decision. Second, to the extent that this contention is a claim that the trial court failed to address and resolve principal controverted issues, appellants have waived this alleged error because they did not bring these omissions to the trial court's attention.

The statement of decision found that appellants breached their duty to audit for compliance with applicable laws and regulations, that appellants failed to understand the internal control structure of the county, that they failed to gather sufficient evidential matter, and that they failed to supervise the audits. The trial court did not find that appellants were disciplined because they failed to discover that the county's investments were "illegal."

In light of appellants' failure to bring to the trial court's attention that the statement of decision omitted to resolve controverted issues, we imply findings that support the judgment (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134 [275 Cal.Rptr. 797, 800 P.2d 1227]),[8] in addition to the trial court's express findings.

In the instance of appellant McBride, in addition to the findings of the statement of decision, the Board found that McBride failed to include

---

[8] "The clear implication of this provision [Code of Civil Procedure section 634], of course, is that if a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment. Furthermore, section 634 clearly refers to a party's need to point out deficiencies in the trial court's statement of decision as a condition of avoiding such implied findings, rather than merely to request such a statement initially as provided in section 632." (*In re Marriage of Arceneaux, supra*, 51 Cal.3d 1130, 1133–1134.)

reportable conditions in the required reports on internal controls for the 1992 and 1993 audits, failed to document the testing of interest revenue in both audits, failed to properly plan and supervise staff auditors in both audit engagements, willfully failed to comply with the requirement to issue a report that conformed to professional standards, failed to maintain the proper level of professional skepticism regarding management representations, and accepted management's assertions without corroboration in the area of compliance with laws and regulations.

In the instance of appellant Parker, in addition to the findings of the statement of decision, the Board found that Parker failed to include in the required reports a "material weakness" and other reportable conditions, failed to adequately document the testing of interest revenue, failed to properly document the testing of the internal audit, failed to properly plan and supervise staff auditors in both audit engagements, failed to perform required procedures concerning the county's compliance with investment laws and regulations, failed to maintain the proper level of professional skepticism regarding management representations, and accepted management's assertions without corroboration in the area of compliance with laws and regulations.

The Board's conclusions as to appellant Timon are substantially like those as to appellant Parker.

The foregoing is not a complete list of the Board's conclusions as to appellants' failures to meet professional standards. Each of these conclusions rests on a series of factual findings that are reflected in the administrative record. These findings and conclusions support the trial court's judgment.

3. *The Finding That Appellants Were Under a Duty to Test for Compliance with Investment-related Laws Is Supported by the Evidence*

The trial court found that generally accepted accounting principles required that appellants evaluate compliance with investment-related laws. Appellants contend that this is a "new standard," which the Board did not have the authority to impose retroactively on appellants.

Under the facts and circumstances of this case, appellants' argument is without merit for several reasons.

First, KPMG's general audit plan for 1992 stated that the United States Auditor General requires that auditors report on compliance with laws and regulations, and that, among other things, KPMG would " 'identify any material instance of noncompliance' " with applicable state laws. Second, KPMG

identified compliance with investment laws as an important audit objective in the 1992 and 1993 general audit plans. Third, the county asserted in its financial statements that it did not violate laws dealing with deposits, investments, or reverse purchase agreements. Fourth, various written professional standards require audits for compliance with investment-related laws.[9] Fifth, there was expert testimony that auditors engaged to audit a public agency have a duty to test and report on compliance with investment-related laws and regulations.[10]

The trial court's finding that in this case appellants were under a duty to test for compliance with investment-related laws is supported by substantial evidence.

4. *The Trial Court's Finding That Appellants Were Grossly Negligent Is Supported by Expert Testimony*

Appellants contend that the Board's, and the trial court's, findings that appellants were grossly negligent are not supported by expert testimony.

The trial court found, and the record confirms, that the Board's experts Harden and Dick testified that appellants were grossly negligent.[11] Thus, the trial court's finding rests on substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479] [the testimony of a single, credible witness may constitute substantial evidence].)

Appellants contend that the trial court did not independently review the record to determine whether appellants had been grossly negligent. This is incorrect since the statement of decision expressly cites to the testimony of experts Harden and Dick. (See fn. 11, *ante.*) Appellants also contend that the trial court found them to have been grossly negligent because appellants

---

[9] Among others, these are AU 801.23 and AU 801.103, appendix B, paragraph 3. The Auditing Standards Board of the American Institute of Certified Public Accountants issues statements of auditing standards that explain the 10 broadly phrased generally accepted accounting standards. These are codified in the "AU" sections.

[10] The Board found that the experts who testified for respondent opined that an auditor engaged to audit the financial statements of a government entity has a duty to test and report on compliance with investment-related laws and regulations. Several reasons were given for this opinion. Among these are the importance that is attached to disclosures regarding investment laws by written professional standards and the fact that a governmental entity is required to make certain disclosures regarding investments in its financial statement. One of these experts, Mark Dick, has 30 years of experience in performing government audits and performs or supervises 15 to 20 governmental audits per year.

[11] As an example, Harden testified at one point that appellants "were grossly negligent in the conduct of the 1993 Orange County audit in the area of auditing management's assertions regarding compliance to laws and regulations governing investments. . . ."

failed to discover and disclose that the county engaged in an " 'illegal investment scheme.' " This, too, is in error since, as we have seen, the trial court expressly relied on expert testimony that appellants had been grossly negligent.

### 5. The Discipline Imposed on Appellants Is Not Predicated on Violations of Investment-related Laws

Appellants contend that there is no evidence in the administrative record that there were "significant violations of investment laws." (Fn. omitted.)

Appellants were disciplined not because "investment laws" were violated, but because they failed to comply with professional standards.

Appellants' contention on this score, i.e., that there were no significant violations of investment laws, amounts to a "no harm—no foul" argument. However, in light of the actual events, such an argument is neither realistic nor well-founded. One has to look no further than to Citron's conviction for violations of investment laws and regulations, if not the county's bankruptcy, to know that laws and standards were violated. In this connection, it is noteworthy that the Board found that at no time during the relevant period did "anyone from KPMG" talk to Citron about the OCIP or the treasurer's investments. The point is that outside auditors have a role to play, and that the appellants failed in that role.

### 6. The Board's Decision "Bridges the Analytic Gap Between the Raw Evidence and the Ultimate Decision" and Thus Satisfies Topanga Assn. for a Scenic Community v. County of Los Angeles

In *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12] (*Topanga*), the court held that an administrative determination must "bridge the analytic gap between the raw evidence and [the] ultimate decision."

Appellants contend that the Board's decision does not meet this standard. All the decision does, appellants contend, is to "list in several findings the separate respects in which it concluded Appellants' work fell below (what it improperly regarded as) the applicable standard of care," and then, without "bridging the gap," the decision states in "boilerplate" that appellants' conduct was grossly negligent.

A review of the Board's approach to explaining the bases for its decision shows that appellants' contention is without merit.

In imposing discipline on appellants, the Board, like the ALJ, adopted what it termed "LEGAL CONCLUSIONS [¶] (BASES FOR DISCIPLINE)" as to each of the appellants. We refer to appellant Parker as illustrative of the Board's approach in imposing discipline on appellants.

"4. Cause exists to impose discipline on the Certified Public Accountant's Certificate and the underlying licensing rights of Respondent Joseph Horton Parker for gross negligence under Business and Professions Code Section 5100(c), based on the following conduct or omissions that occurred during the 1992 Orange County audit:

"(a) Respondent Parker failed to perform his duties with respect to auditing testing and documentation of compliance with investment laws and regulations in the 1992 audit engagement of Orange County, as set forth in findings 57 through 99, and in the legal conclusions set forth in paragraphs 100 and 104;

"(b) Respondent Parker failed to test for compliance with investment laws and regulations. As a result, Respondent Parker could not verify management's assertion that it did not violate significant legal or contractual provisions for investments in the County's 1992 GPFS [General Purpose Financial Statements], as set forth in findings 57 through 99, and in the legal conclusions set forth in paragraph 104;

"(c) Respondent Parker failed to gain an understanding of the internal control structure sufficient to plan the audit in the area of compliance with investment laws, as set forth in findings 60 through 86, and in the legal conclusions set forth in paragraph 100;

"(d) Respondent Parker failed to document the assessment of control risk and the basis for such assessment, as set forth in findings 133 through 147, and in the legal conclusions set forth in paragraph 161;

"(e) Respondent Parker failed to include a material weakness and a reportable condition in the required reports on internal controls, as set forth in findings 148 through 159, and in the legal conclusions set forth in paragraph 161;

"(f) Respondent Parker failed to adequately document the testing of interest revenue, as set forth in findings 207 through 209, and in the legal conclusions set forth in paragraph 229;

"(g) Respondent Parker failed to properly document the testing of Internal Audit, as set forth in findings 171 through 190, and in the legal conclusions set forth in paragraph 229; and

"(h) Respondent Parker failed to properly plan and supervise staff auditors in the 1992 engagements regarding testing for compliance, assessment and reporting on internal controls, consideration and testing of Internal Audit's work, and the clear lack of documentation in the Substantive Audit Program Guide, as set forth in findings 266 through 278, and in the legal conclusions set forth in paragraph 286."

In an additional paragraph 5, the Board found that cause existed to impose discipline on Parker under Business and Professions Code section 5062, in conjunction with section 5100, subdivision (f), for unprofessional conduct in connection with the 1992 Orange County audit. The details of this finding are set forth in subparagraphs (a) through (d) of paragraph 5 and follow the same approach that is taken in paragraph 4 above. Paragraphs 4 and 5 constitute the Board's findings as to Parker.

The remaining appellants are treated in the Board's decision in the same manner, and in the same detail, as in the instance of Parker. The "LEGAL CONCLUSIONS [¶] (BASES FOR DISCIPLINE)" as to all of the appellants extend to over nine single-spaced pages.

The Board's approach was designed to, and did, "bridge the analytic gap" between the evidence and the Board's decision. The Board concluded that each of the appellants failed in specified ways to meet professional standards. Each of those specific conclusions is based on specifically designated findings of fact. As appears in the illustrative instance of Parker, the Board's decision that he failed to perform his duties with respect to testing for compliance with investment laws (paragraph 4(a)) is tied to findings of fact 57 through 99, and legal conclusions set forth in paragraphs 100 and 104. The Board's conclusion that Parker failed to meet professional standards because he failed to gain an understanding of the internal control structure (paragraph 4(c)) references findings of fact 60 through 86. The findings of fact and the "legal conclusions" are detailed and specific. As an example, finding of fact 58, which is that appellants were under a duty to test for compliance with laws governing investments, is divided into 13 paragraphs which discuss the evidence, the audit plans generated by KPMG, accounting standards, and expert testimony in great detail.[12] There is nothing "boilerplate" about this. In our experience, the Board's (and the ALJ's) decision is a carefully and thoroughly crafted decision that serves as an example of how an administrative decision should "bridge the gap" between an extraordinarily large and complex body of evidence, and the administrative decision that is based on that evidence.

---

[12] Footnote 10, *ante*, contains a summary of one of these 13 reasons, which was that expert testimony supported the conclusion that appellants were required to test and report for compliance with investment-related laws.

Appellants seize on one sentence in the Board's findings in an effort to show that the Board's findings are inadequate under *Topanga, supra,* 11 Cal.3d 506. The context of this sentence is the citation, in the Board's findings, of appellants' contention that an auditor is not required to test for compliance with investment laws unless something comes to the auditor's attention that produces evidence of a possible illegal act. The sentence that appellants seize on follows the foregoing and is this: "In general, respondents' interpretation of the written standards is correct." Appellants contend that "[m]issing from the Board's Decision is any explanation of how Appellants' conduct fell below the then-existing standard of care given their 'correct' reading of the existing literature, and the consistent understanding of other auditors."

Appellants themselves have "missed" that, following the quoted sentence, the Board's decision states that under the facts of this case the general rule does not apply and that there was a duty to test for compliance. The Board then gives no less than 13 detailed and specific reasons why this is so. This is done in finding of fact 58, which we have described above. As noted, this finding is extraordinarily detailed.

Appellants' characterization of the Board's decision as inadequate under *Topanga* ignores the decision itself and is without merit.

7. *The Finding That Appellant McBride and KPMG Were Grossly Negligent with Regard to OCTA's Financial Statement Is Supported by Substantial Evidence*

The Board concluded in its finding 397 that McBride and KPMG were grossly negligent in that they failed to take "appropriate action with regard to their client, OCTA [Orange County Transportation Authority], after becoming aware of information that indicated a potential impairment of the OCTA investment with the OCIP. Said failure to take appropriate action was a violation of AU section 561." The trial court upheld this finding. Appellants contend that this finding is not supported by the evidence.

AU section 561 describes the auditor's obligation concerning facts discovered by the auditor after the issuance of the financial statement, when the facts are "of such a nature and from such a source that [the auditor] would have investigated it had it come to his attention during the course of his audit." AU section 561 requires the auditor to determine whether information about these newly discovered facts is reliable, and whether these facts existed at the time of the financial statement. The auditor should discuss this matter with management and request from management cooperation with his investigation. If the auditor determines that the report would have been affected if the newly discovered information had been available, and if the auditor

believes that there are persons who are relying on the report, the auditor should advise the client to make disclosure of the newly discovered facts to persons who are relying, or who are likely to rely, on the financial statement.

The audit in question is that performed by McBride and others for OCTA in 1994. Specifically, on October 28, 1994, McBride, as the "engagement partner" for the OCTA audit, issued the opinion that OCTA's 1994 financial statement was "fairly presented in all material respects." This was approved by OCTA's board of directors on November 28, 1994. In relevant part, the financial statement disclosed that OCTA's total cash and investments were $893 million, and that $885 million of this amount was "held 'on account with' " the OCIP.

The first indications of a decline in the market value of OCIP's assets came in the spring of 1994 during the campaign for Orange County treasurer. Citron's reelection was opposed; in June 1994, his challenger claimed that OCIP's assets had declined in the last five months by $1.2 billion. These charges were widely reported in the press. McBride was aware of these allegations.

Although the June 30, 1994 Moneymax report stated that the market value of the OCIP investments had declined $440 million below cost, the Board found that McBride did not learn of this report until the first week of November 1994. However, the Board found that by the first week of November, McBride was aware of a number of significant factors that, together with the Moneymax report, put McBride on notice of conditions that had not been reported in OCTA's financial statement of October 1994. Interest rates had been rising since the early spring of 1994; this bore directly on the market value of OCIP's assets. Citron was purchasing "inverse floating rate securities," which were highly sensitive to a rise in the interest rates. McBride was also aware of the fact that as of April 1994 Citron was required to put up $300 million in additional collateral. These factors, along with some others, should have caused McBride, in early November 1994, to thoroughly analyze and test the OCIP portfolio and the effects in the changes in that portfolio on OCTA's investment.

However, instead of a thorough investigation by McBride or a person of equivalent expertise, McBride delegated the inquiry into OCIP's assets to a subordinate who did no more than refer to the Moneymax report, and who obtained an assurance from one of Citron's assistants that any losses were not permanent. McBride continued to rely on the treasurer's office without any independent investigation even after she learned in mid-November 1994 that OCIP's market value was being written down by as much as $1.5 billion. The Board found that "[t]hroughout this time, Respondent McBride never advised

OCTA regarding any of the information she had learned concerning the drop in market value. This was a violation of the professional Standard AU 561. [¶] 386. The extent of Respondent McBride's inquiry was to ask Assistant Treasurer Raabe how Treasurer Citron planned to deal with this major market value decline and to accept his answers without question. Respondent McBride's inquiry concerning potential permanent impairment of OCTA's funds in the OCIP was clearly inadequate, and was an extreme departure from professional standards as set forth in AU Section 561."

■ Appellants contend that the Board's finding regarding McBride's failure to conform to professional standards in the instance of OCTA's October 1994 financial statement is "not supported by the evidence." (Capitalization and boldface omitted.) Appellants' argument suffers from two defects. First, it is based on a selective rendering of the facts that marshals evidence that supports *appellants'* theory of the case. Second, appellants' contention disregards the rule that in an appeal from an administrative determination, the question is whether substantial evidence supports the trial court's ruling that upholds the determination. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824 [85 Cal.Rptr.2d 696, 977 P.2d 693].) Under the substantial evidence rule, we consider the evidence in the light most favorable to respondent Board, draw every reasonable inference in favor of Board, and resolve all conflicts in the evidence in support of the judgment. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 359.)

There is no question that substantial evidence supports the trial court's finding. By the first week of November 1994, well in advance of the November 28, 1994 approval by OCTA's board of the October 28, 1994 financial statement, McBride knew of several factors that required an immediate, and effective, investigation of OCIP's assets. However, instead of a prompt and effective investigation, McBride relied on verbal assurances by Orange County's assistant treasurer, and on a subordinate whose investigation uncovered nothing but what was already known. Given what McBride knew, and given the seriousness of the problems that were evident in early November 1994, we agree that McBride's passivity was indeed an "extreme departure" from what an independent auditor should have done.

Appellants point to the facts that McBride attended a meeting on November 16, 1994, when she was assured by county officials that all would be well, and that McBride asked the county for an analysis of its situation. Even without reference to the substantial evidence rule, these events do nothing to assist McBride. Professional standards required more than an ear that was open to whatever assurances the county was ready to serve up.

The court's finding that McBride was grossly negligent with regard to OCTA's October 1994 financial statement is supported by substantial evidence.[13]

8. *The Finding That Appellants McBride and Timon Were Grossly Negligent in Connection with the "Titus Consultation" Is Supported by Substantial Evidence*

Martin E. Titus was a senior manager in the KPMG Cleveland, Ohio, office, and is an expert in investment securities practices. He was consulted by appellant McBride and by Freedman in 1993 and 1994 in his capacity as an expert in investment securities. The Board found in its findings 324 and 325 that appellant McBride and Freedman[14] were grossly negligent in imparting incomplete information to Titus and in failing to investigate certain aspects of OCIP's portfolio. The Board also found that appellants McBride and Timon engaged in unprofessional conduct in creating the appearance that a critical document, "workpaper B-A-4," was prepared earlier than it was actually prepared. In substance, the trial court upheld these findings. We imply findings to the extent it is necessary to support the judgment. (See fn. 8, *ante.*)

Appellants consulted Titus in order to determine whether, in light of Titus's knowledge of investment securities, the county's investments appeared to be appropriate, and to learn the risks posed by the type of investments in securities that the county was making.

Titus's first significant contact with the Orange County audits was in December 1993 when he spoke with Freedman and Orange County assistant treasurer Raabe. Raabe told Titus that Orange County was entering reverse purchase agreements to buy floating rate securities and that the county was managing the resulting interest rate risk by matching coupon reset dates of the securities with the maturity dates of the underlying purchase agreements. The county's claim that it was matching coupon reset dates with maturity dates was significant to Titus because it was represented to be the county's primary risk management technique. However, Titus could not verify from the materials and information that he had been given whether the county was actually matching dates. The Board found that McBride and Freedman had a duty to investigate whether the treasurer was actually matching the dates, especially since both McBride and Freedman knew that Raabe had not told Titus that the county had been purchasing inverse floating rate securities (see text, *post*).

---

[13] This finding extended to KPMG, which has abandoned its appeal.

[14] As noted, no discipline was imposed on Freedman in the interests of justice and he is not party to this appeal.

Raabe did not tell Titus that in 1993, and perhaps earlier, Orange County had been purchasing inverse floating rate securities. Freedman did not tell Titus that Raabe had omitted this information. Freedman gave McBride a summary of the talk with Titus. McBride also knew that Orange County had "inverse floaters" in its portfolio, but did not alert Titus to this fact. The treasurer was buying inverse floaters with the proceeds of the reverse purchase agreements. The presence of inverse floaters in the portfolio created a potential for a serious problem in the event of a rise in interest rates. Thus, it would have been an important fact for Titus to know that Orange County had purchased inverse floaters.

The Board found that Freedman's and McBride's failure to tell Titus that Orange County was buying inverse floaters, their failure to investigate the extent of inverse floaters in the portfolio, and their failure to investigate whether the treasurer was matching dates was an extreme departure from professional standards.

In December 1994, amid increasing concern over OCIP's and Orange County's investments, appellant Timon authored workpaper B-A-4 in which he purported to summarize the conversation between Titus and assistant treasurer Raabe, and particularly Raabe's representation that the county was matching the coupon reset dates of the securities with the maturity dates of the underlying purchase agreements. The workpaper concluded with the observation that Titus was "comfortable" with Orange County's investment practices. Significantly, this workpaper contained the date December 1993 in its upper right hand corner, even though the workpaper was written in December 1994.

The Board found that the false dating of this workpaper was done with the deliberate intent on the part of McBride, Timon and Freedman to create the impression that Titus's "comfort" with Orange County's investment practices was the result of misrepresentation by assistant treasurer Raabe to Titus in December 1993, specifically by Raabe's false statement that the county was "matching dates." The Board found that this was an attempt by appellants to imply that deficiencies in their handling of OCIP financial statements were the result of Raabe's misrepresentation to Titus in December 1993.

On December 6, 1994, amid Orange County's burgeoning problems, Titus wrote a memorandum in which he noted that the county had represented that it was "matching dates," but that "the entire set of securities classified as floating rate[s] were in reality inverse floating rate securities with random reset dates." Titus wrote that this exposed the county to "tremendous risks," both in terms of market value and negative cash flow. The Board found that

Titus's December 6, 1994 memorandum was part of the strategy to shift blame to Raabe's misrepresentations of December 1993.[15]

Given the stable interest rate environment in 1992 and 1993, the Board found that the market value disclosures in the 1993 financial statements met professional standards. However, rising interest rates in 1994 posed a danger in light of the investment strategy the county was pursuing, and this required prompt and effective investigation and, if found to be true, disclosure.

Appellants contend that since there is nothing illegal about inverse floaters, there need not have been any disclosure of this investment practice. The error in this is demonstrated by Titus's memorandum of December 6, 1994, if not the Board's findings. As long as interest rates were stable, inverse floaters posed no risk. It was when interest rates rose and when, as Titus put it, inverse floating rate securities had random reset dates, that these investments became extraordinarily risky. Given the financial storm signals that appeared throughout the year 1994, the inverse floaters with random reset dates should have been investigated and disclosed in a timely manner.

Appellants also contend that they did investigate Raabe's assertion that the county was "matching dates" because Freedman visited the treasurer's office and learned that spreadsheets were being employed for the purposes of matching. This is again an instance when appellants point to evidence that favors their theory of the case, and when they ignore the substantial evidence that supports the trial court's ruling. The Board found that McBride and Freedman did not question Citron or Raabe regarding the extent of inverse floaters in the portfolio. This is substantial evidence that supports the judgment. (*Fukuda v. City of Angels, supra,* 20 Cal.4th 805, 824.)

Appellants contend that Titus's work had no impact on the county's 1993 financial statement. That is true. It was when interest rates rose in 1993 and 1994 that the disclosures were required that are summarized, belatedly, in Titus's memorandum of December 6, 1994.

Finally, appellants claim that dating workpaper B-A-4 one year earlier than it was actually written was neither negligent nor done with the intent to mislead. However, the inference is reasonable that in December 1994 appellants sought to deflect criticism by blaming assistant treasurer Raabe for what he omitted to say in December 1993. Dating workpaper B-A-4 contemporaneously with the conversation that it reported certainly assisted in that effort. As the Board found, evading responsibility for their failures to investigate and take action was unprofessional conduct on appellants' part.

In sum, there is substantial evidence that supports the court's finding on the issue of the "Titus consultation."

---

[15] We note in the margin that during the administrative hearing Titus professed to have forgotten writing the December 6, 1994 memorandum.

## DISPOSITION

The judgment is affirmed. Respondent is to recover its costs on appeal.

Rubin, Acting P. J., and Boland, J., concurred.

A petition for a rehearing was denied July 18, 2005, and appellants' petition for review by the Supreme Court was denied October 19, 2005. Kennard, J., did not participate therein.